UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL RIGHTS COMPLAINT

| | |
|---|---|
| **Syed K. Rafi, PhD.** ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| v. ) | Case No. 3:14-CV-1582 VAB |
| ) | |
| **Yale University School of Medicine (YSM)** ) | |
| **&** ) | |
| **YSM-Genetics Dept. Chairman,** ) | |
| **Dr. Richard P. Lifton** ) | |
| **(Official Capacity)** ) | |
| *Defendants* ) | |

## A.  PARTIES

1.  The plaintiff, Syed K. Rafi is a citizen of Kansas City, Missouri State, whose mailing address is: P. O. Box 32302, Kansas City MO. 64171.

2.  The first defendant, Yale University School of Medicine (*as well as the second defendant*) is located in New Haven, Connecticut State, whose address is: 333 Cedar Street, New Haven, CT.  06510.

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? <u>NO.</u>

3.  The second defendant, Dr. Richard P. Lifton is a citizen of Connecticut State, whose address is: Department of Genetics, PO Box 208005, 333 Cedar Street, New Haven, CT 06520-8005, and who is  employed as: Sterling Professor of Genetics and Professor of Medicine (Nephrology); Chair, Department of Genetics,  Yale University School of Medicine, 333 Cedar Street, New Haven, CT.  06510.

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? NO.

## B. JURISDICTION

Pursuant to U.S. Code, Title 28, part IV, chapter 85, code § 1332 - Diversity of citizenship; amount in controversy; costs- the District Courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, as is determined in this case given the extent of the alleged continuing retaliatory violations in this complaint, and since the litigation is between citizens of different States, wherein, pursuant to Code § 1391-

**(1) A civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located, as is the case in this litigation; and**

**(2) A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, as is also the case in this litigation;**

**Jurisdiction also is invoked pursuant to 28 U.S. Code § 1343.**

## C. NATURE OF THE CASE

I.     I am an Asian of East Indian Heritage. I am 65 years of age and a male of Islamic/Muslim faith. I believe that I have been discriminated against by being passed over for hiring of professional Clinical Cytogenetics, Medical Genetics Research, as well as related technical positions which total >70 job applications as of the above latest date **ever since I left Yale School of Medicine after completing my professional clinical cytogenetics training in 2004,** primarily at Brigham and Woman's Hospital (and also at other Harvard affiliated hospitals,

Tuft's University Hospital, and all over the country!) for professional clinical cytogenetics positions at every level, given the fact that clinical cytogeneticists are in great demand and highly paid.

II.                Alas, I have neither been considered even for a single interview in my professional field of clinical cytogentics, nor awarded any of those more than 70 positions at Harvard Medical School alone (Attachment # 1), and around the nation, because of political and legal motives by the defendant, Yale School of Medicine, through Dr. Lifton, Chairman of the Genetics Department at Yale School of Medicine, in his official capacity. That the positions I applied for were not offered to me because of the Defendant's dire need to escape a potential discrimination claim by a terminated Middle Eastern employee and to facilitate the return of yet another employee who was also simultaneously removed "to deny" the disgruntled and politically very active Middle Eastern *(with a large body of Yale- Middle Eastern student and faculty followers)* former employee a *prima facie* case and a platform for accusing YSM of intentional racial discrimination against him for his termination, as he had sent email(s) to YSM officials warning against termination of his position at YSM just prior to his termination.

III.                Now, he might at least stage a demonstration at Yale along with his large Middle Eastern student and faculty- supporters, alleging Yale having stealthily removed him along with the native female faculty member merely to deny him the opportunity *(a prima facie* case of retaliation and racial discrimination) to take legal action against Yale at that time, and might seek his rehiring as well through legal means, as he is: (I) still maintaining his residence in New Haven, CT; (2) still politically active and very influential among the Yale University's Middle Eastern students and faculty; (3) still active in the US Green Party

movement; and (4) he is also increasingly well-known and influential at the inter-national arena given his political activism (see: *qumsiyeh.org/Articles* **by Qumsiyeh • Activist Manual ... Qumsiyeh being arrested in Al-Walaja 6 May 2010 and (below) on ... and the list. CONTACT US:** **mazinqumsiyeh.org;** *keywikLorg/index.php/Mazin Qumsiyeh* *;forusa.org/blogs /frank-kromko wski/mazin-qumsiyeh...peace.../12325 electronicintifada. net/tags/mazin-qumsiyeh mondoweiss.net/author/mazin-qumst:yeh keywiki.org/index. php/MazinQumsiyeh;* en.wikipedia.org/wiki/Stereotypes *of Arabs and Muslims in the Unit...; also see below under the preliminary discovery **(attachments # 11), documentation of Dr. Oumsiyeh's political activism during 2001- 2002, prior to ending his faculty position at Yale School of Medicine.* D**r. Qumsiyeh defended his prolific political activism as his First Amendment Right under the US Constitution!**

V.         This might damage Yale University's current close financial and educational ties in the Middle East, and affect the sentiments of the large Middle Eastern students and faculty at the Yale campus **(See: Big donations to American colleges from the Muslim world ...** *creepingsharia.wordpress.com/.../big-donations-towarnerican-collegegro,.;* May 18, 2011 - Yale University received $500,000 from Bahrain this January and Stanford University received a $149,97 0 gift from Saudi Arabia Universities ... ; **Schools accept prince's money I Yale Daily News** *yaleclailynews.comMiogy2006/0.1/09/schools-accepts-money/* Jan 9, 2006 - Yale was passed over last month when controversial Saudi Prince Alwaleed ... The donations have been accepted by both universities, but the ... ; **Yale Selects Daughter of Global Muslim Brotherhood Leader as ...** *wwwcampus-watchvorWarticlefidA91-14* Aug 24, 2009 - Yale University President Richard C. Levin, said it is extremely useful ... Participants from Saudi Arabia, Turkey, India, China and Russia, will be; *Yale* **Selects Daughter of Global Muslim**

Brotherhood    Leader    as    *www.campus-watch.org/article/ic1/8144*    Aug    24,

2009 - According to the report: *Yale University* selected Muna Abu Sulayman, *Yale University*

President Richard C. *Levin,* said it is extremely useful to have ... Participants from Saudi *Arabia,*

Turkey, India, China and Russia, will be ... ; **Archived-Articles: Why Did** *Yale* **Censor the**

**Danish    Cartoons?**    *www.americanthinkercom/2009/.../why_dicl_yale_censor_the_danish.ht...*

Sep 15, 2009 - *Yale University,* through the Office of the President, Richard *Levin,* ... freely

admitted to Klausen that she had frequented Saudi *Arabia).*

VI.              However, it is now clearly understood that YSM through its Genetics

Department Chairman, Dr. Richard Lifton had given the promise of hiring back the cosmetically

terminated female YSM employee after some time given the fact that her husband is a high

ranking influential tenured professor at YSM and her residence is also in the New Haven (YSM)

area (Gilford, CT).

VII.             In order to accomplish this orchestrated defensive and deceptive plan,

YSM had planned to use Dr. Syed Rafi as a defensive witness against the terminated former

YSM- Middle Eastern faculty member, since I had submitted a confidential report against the

Middle Eastern faculty member prior to his termination upon Dr. Lifton's coercive request to me

to do so, when I approached Dr. Lifton's seeking his help in getting my professional clinical

cytogenetics training certified as successfully completed. However, in my confidential report, I

had a binding statements against using his confidential report for any legal defense purpose

(Attachment # 2).

VIII.   Therefore Dr. Lifton undeniably influenced HMS's leading clinical cytogenetic faculty

members, such as Dr. Cynthia Morton and others, and thus prevented them from offering me any

kind of position at HSM where I longed to be hired and thus could settle in Boston, as is evident in his SOS emails to Dr. Lifton, requesting Dr. Lifton to let him do so, as he certainly needed the recommendations from YSM medical genetics faculty members, including Dr. Lifton *(Chairman, Genetics Department who had served as a faculty member at Brigham and Woman's Hospital, HMS, prior to his appointment as the Chairman of the Genetics Department at YSM, and thus he remained very influential at BWH/HMS),* since I did my professional (American Board of Medical Genetics (ABMG)- accredited) clinical cytogenetics training at YSM-Genetics Department.  Further, I have  meticulously maintained emails from HMS faculty, such as, Dr. Morton, advising me to seek a position at Yale School of Medicine instead, indicating that I am needed there…

VIII.        Since I initially refused to return back to YSM along with "displaced" former YSM faculty at HSM, by refusing Dr. Lifton's job offer *(which was conveyed through a HMS cytogenetics faculty member, Dr. Fred Bieber)* to direct clinical cytogenetics at YSM after the termination of the Middle Eastern YSM faculty member, with the sole aim of using me as a witness against the terminated Middle Eastern faculty member *(given the fact that: (1) I had submitted a written document to Dr. Litton condemning the Middle Eastern faculty member's conduct; (2) I worked with the Middle Eastern professor during his professional training at YSM; (3) I am of Islamic faith; and (4) most importantly, the "displaced" cosmetically terminated YSM faculty member who had also taken a temporary faculty positon at the Children's Hospital Boston (CHB) and Massachusetts General Hospital, HMS),* initially Dr. Lifton, and later the "displaced" former YSM faculty member essentially through her influential CHB/HMS-colleague, Dr. Mira Irons continued to influence Dr. Morton and others at HMS so that I could not be considered for any professional clinical cytogenetics position at Dr. Morton's

ever-expanding clinical cytogenetics operation at HMS/BWH. I was unable to find a professional cytogenetics positon outside of HMS (around the nation!) due to this on-going coercive and ceaseless retaliation against me, and that led to the total lack of any job recommendation either from YSM or from the nationally recognized clinical cytogeneticist, Dr. Cynthia Morton at HMS.

IX.  This led to the ceaseless and reckless coercive retaliation against every one of my professional clinical cytogenetics as well as medical genetics research job opportunities not only at HMS, but also around the nation since 2004. During this period, YSM had advertised job openings more than 3 times fitting the qualifications of Dr. Pober. However, just at the beginning of last year, Dr. Pober found a job opening at the newly founded Quinnipiac Medical Center which is located adjacent to YSM- New Haven area instead. However, it is presumed that she is still seeking to be hired back at YSM as Chief of Clinical Genetics (as per the repeated YSM job advertisement over these years), and therefore my job applications at HMS and elsewhere as well continue to be coercively retaliated against. Consequently, I have deviated away from my professional field of diagnostic clinical cytogenetics, and taken-up instead a basic biological research position in the Midwest for the past couple of years which is far away from YSM and HMS.

XI. I had also worked at CHB as a manager of a non-professional service laboratory, alas, I was also forced leave that position after a year due to the documented pressure from the influential CHB colleague (Dr. Irons) of the displaced former YSM faculty at CHB. The same CHB colleague was also directly responsible in denying me the federally funded ABMG-molecular genetics and additional cytogenetics trainings, as she was serving as the director of the AMBG-medical genetics training program of the Harvard Medical School at that time.

**X.** Dr. Richard Lifton, Chairman, Genetics Department, Yale School of Medicine; Dr. Barbara Prober (former YSM faculty at Harvard Medical School); Dr. Mira Irons (Faculty at HMS/CHB); and Dr. Cynthia Morton (Faculty at BWH/HMS) **were / are  responsible for my not being hired in my professional clinical cytogenetics field, and for the alleged coercive, ceaseless and reckless retaliation and discrimination against my professional and research job applications (>70) at HMS and elsewhere around the nation as well for such a prolonged period of time, with total disregard for my Civil Liberties!**

**XI.**    <u>**Therefore I believe that I have been subjected to coercive and ceaseless and reckless retaliation, as acts of continuing violations.**</u>

## D.  CAUSE OF ACTION

<u>CLAIM- I:</u>

<u>PRIMARY RATIONALE FOR THE ALLEGED VIOLATIONS:</u>

1.  **My Written Complaint to Yale School of Medicine (YSM)- Genetics Department Chairman, Dr. Richard Lifton Prior to Departing YSM:**

As indicated above, I have documented record of having submitted a written complaint to the Yale University School of Medicine (YSM)- Genetics Department Chairman, Dr. Richard Lifton, per Dr. Lifton's demand to do so  (**Attachment # 2**), alleging **"discriminatory employment practice, retaliation, unfair job offer to a foreigner ignoring more qualified US-citizens, coercion,  discrimination in US- federally funded medical genetics training**

**position, exploitation and political activism"** at his clinical cytogenetics laboratory by the Middle Eastern professor of genetics and director of clinical cytogenetics at Dr. Lifton's genetics department, who has since been removed from his faculty position. But he was expected to bring a law suit against YSM indicating race based discrimination for his dismissal. Therefore YSM initially wanted to use me as witness against that Middle Eastern professor, and consequently held back my initial job opportunities at HSM by not providing appropriate recommendations to enable HSM to consider my initial job applications (records of emails with me clearly indicate this scenario!).

## CLAIM-II:

## ADDITIVE RATIONALE FOR THE ALLEGED VIOLATIONS:

2. **Plaintiff's prior openly and readily available record of Title VII Civil Rights violation complaint:**

Plaintiff's readily available record of having filed an EEOC complaint asserting violations of Title VII Civil rights, and the resultant Civil suit against the National Institutes of Health (NIH), US Department of Health and Human Services (DHHS)- record of which is unfortunately readily available on the internet (*despite Plaintiff and his attorney having requested that judge who handled the case at the District of Columbia US District Court to remove it from the public display*), as shown below:

> ***Google internet search finding: Search Results: (0.53 seconds):***
>
> **[PDF] UNITED STATES DISTRICT COURT FOR THE DISTRICT...**
>
> **www.gpo.gov/.../USCOURTS-...**

**Oct 30, 2006 - SYED K. RAFI, volunteer positions that plaintiff Dr. Syed Rafi sought at the ... that one benefit of a volunteer position alleged by plaintiff** -

Yale School of Medicine Chairman, Dr. Richard Lifton (*who happens to be a very close to NIH officials, since the current NIH director is a former medical genetics fellow at YSM, and both are eminent medical geneticists; Dr. Lifton frequently attends high level meetings at NIH* ), or through BWH Human Resources (HR) consequent to HR- background search routine.

In my NIH-EEOC- Civil Case, I have accused the NIH officials, including the current NIH Director, and the current NIH- Cancer Institute Director, as having discriminated against his repeatedly, in violation of my Title VII Civil rights and also in violation of the Rehabilitation Act of 1973- since I was at that time a "Reduction-In-Force"- separated former employee of the Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington, DC.  It is important to note, as the record would indicate that Dr. Lifton is a continuous recipient of NIH- research grant money amounting to hundreds of millions of dollars annually.

I believe that the above two records of having exercised the right or privilege secured by the US Civil laws synergistically caused the alleged long standing and collective ceaseless and reckless  retaliation by YSM through Dr. Lifton, in his official capacity.

## CLAIM- III:

<u>I ALLEGE THAT THE FOLLOWING OF MY CONSTITUTIONAL RIGHTS, PRIVILAGES, OR IMMUNITIES HAVE BEEN VIOLATED AND THAT THE FOLLOWING FACTS FORM THE BASIS OF MY ALLEGATIONS:</u>

**<u>This unbelievable continuing violation of my Civil rights,</u>** as a naturalized citizen of this country, totally destroying my professional clinical cytogenetics career, as well as my medical genetics research job opportunities since 2004. Further, this **<u>Continuing Retaliation</u>** has also caused the denial of US- Federal Government funded ABMG- medical genetics / molecular genetics training programs at Harvard Medical School and around the country to this date. I sincerely believe that the HMS-affiliated teaching institutions collectively, <u>in conjunction YSM</u> have been retaliating against each and every one of my professional clinical cytogenetics, medical genetics research and training applications.

## I.   *PRIMA FACIE* CASE OF RETALIATION UNDER TITLE *VII OF THE CIVIL RIGHTS ACT OF 1964*

*Title VII of the Civil Rights Act of 1964* **explicitly prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act.**

**Title VII of the Civil Rights Act of 1964 explicitly prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act (42 U.S.C. § 2000e-3(a).**

*Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e, strictly and explicitly prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) amends several sections of Title*

*VII, and In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII.*

*To prove retaliation, a complainant has to show, among other elements, that he or she suffered an "adverse employment action."*

*Until recently, federal courts were split as to the definition of that term. Some courts held, for example, that it had to be an "ultimate employment decision" such as hiring, terminating, promoting or compensating, while others held that it was any "materially adverse change in the terms and conditions of employment," such as suspension without pay or demotion. (See Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997); and See, e.g., Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999) (noting that "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation).*

*On June 22, 2006, the United States Supreme Court resolved this split, issuing a decision which expands the rights of employees under Title VII. In Burlington Northern Santa Fe Railroad Co. v. White,4 the Court held that an employer's actions will be considered an adverse employment action if the conduct "would have been materially adverse to a reasonable employee or job applicant," and the action could "dissuade a reasonable worker from making or supporting a charge of discrimination." In addition, the Court expanded the scope of the definition of "adverse employment action" by stating that it "extends beyond workplace-related or employment-related retaliatory acts and harms." This expansive definition, therefore, could include things that occur beyond everyday interactions in the office, such as vandalism, refusing to provide post-employment information (such as references), or continually calling or driving by an employee's home for intimidation purposes.*

*Recently, the first Circuit Allowed Retaliation Claim to Proceed Absent Direct Evidence of Decision Makers' Retaliatory Animus (See, Travers v. Flight Services & Systems, Inc., No.*

*13-1438 (1st Cir. Dec. 12, 2013); and in Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, No. 06-1595, U.S. Supreme Court (January 26, 2009), Justices Hold Employee Response During An Internal Investigation Is "Protected Activity".*

II.    **_PRIMA FACIE_ CASE OF RETALIATION UNDER TITLE VI**

*_Additionally, a complainant may bring a retaliation claim under Title VI or under a Title VI regulation that prohibits retaliation. For example, most agency_ Title VI regulations provide that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart." 28 C.F.R. § 42.108(e) (Department of Justice- Regulation).*

**28 CFR § 42.108 Procedure for effecting compliance:**

**_General._ _If there appears to be a failure or threatened failure to comply with this subpart and if the noncompliance or threatened noncompliance cannot be corrected by informal means, the responsible Department official may suspend or terminate, or refuse to grant or continue, Federal financial assistance, or use any other means authorized by law, to induce compliance with this subpart. Such other means include, but are not limited to:_**

*(1) Appropriate proceedings brought by the Department to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and*

*(2) Any applicable proceeding under State or local law.*

***Non-compliance with assurance requirement.*** *If an applicant or recipient fails or refuses to furnish an assurance required under § 42.105, or fails or refuses to comply with the provisions of the assurance it has furnished, or otherwise fails or refuses to comply with any requirement imposed by or pursuant to title VI or this subpart, **Federal _financial assistance_ may be suspended, terminated, or refused in accordance with the procedures of title VI and this***

*subpart.* The Department shall not be required to provide assistance in such a case during the pendency of administrative proceedings under this subpart, except that the Department will continue assistance during the pendency of such proceedings whenever such assistance is due and payable pursuant to a final commitment made or an <u>application</u> finally approved prior to the effective date of this subpart.

***Termination of or refusal to grant or to continue Federal financial assistance.*** No order suspending, terminating, or refusing to grant or continue Federal financial assistance shall become effective until:

***(1)*** The responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means,

***(2)*** There has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this subpart,

***(3)*** The action has been approved by the Attorney General pursuant to § <u>42.110</u>, and

***(4)*** The expiration of 30 days after the Attorney General has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.

Any action to suspend or terminate or to refuse to grant or to continue Federal financial <u>assistance</u> shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.

***Other means authorized by law.*** No action to effect compliance by any other means authorized by law shall be taken until:

***(1)*** The responsible Department official has determined that compliance cannot be secured by voluntary means,

*(2) The action has been approved by the Attorney General, and*

*(3) The recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance.*

### Regulation 28 C.F.R. § 35.134 & § 36.206-- Retaliation Or Coercion:

*No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual **made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.***

*No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.*

*Retaliating against any person because that person has participated in any investigation or action to enforce the Act or this part is prohibited !!!*

### Regulation 29 C.F.R. § 1630.12; And  42 U.S. Code § 12203 –

### Retaliation Or Coercion:

*Retaliation - It is unlawful to discriminate against any individual because that individual has opposed any act or practice made unlawful by this part or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce any provision contained in this part.*

*There are three main terms that are used to describe retaliation. Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in a protected activity. These three terms are described below.*

*An adverse action is an action taken to try to keep someone from opposing a discriminatory practice, or from participating in an employment discrimination proceeding. Examples of adverse actions include:*

• *employment actions such as termination, refusal to hire, and denial of promotion,*

• *other actions affecting employment such as threats, unjustified negative evaluations, unjustified negative references, or increased surveillance.*

*Retaliatory adverse actions are unlawful even if the prior protected activity alleged wrongdoing by a different employer, retaliatory adverse actions are unlawful. For example, it is unlawful for a worker's current employer to retaliate against him for pursuing an EEO charge against a former employer!!!*

*(a)    Prohibition of Retaliation:*

*No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.*

*(b)   Prohibition of Interference, coercion, or intimidation:*

*It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.*

### III.    *PRIMA FACIE* CASE OF RETALIATION UNDER TITLE VI *AND TITLE IX SUPPORT A PRIVATE RIGHT OF ACTION AGAINST RETALIATION BASED ON ALLEGATIONS OF "INTENTIONAL DISCRIMINATION"*

**Furthermore, the Core Antidiscrimination Principles in Recipients of federal aid, such YSM in this allegation, have voluntarily accepted financial assistance exchange for**

16

**accepting the conditions of Title VI or Title IX's regulations, including regulations prohibiting retaliation.**

*Both Title VI and Title IX Support a Private Right of Action Against Retaliation Based on Allegations of "Intentional Discrimination":*

***Even to the extent that courts should construe Title VI or Title IX in light of Title VII, there is a strong argument in favor of implied rights of action against retaliation.***

*Title VI reaches private actors who are recipients of federal funds  (Pamela S. Karlen, Disarming the Private Attorney General, 2003 U. ILL. L. REV. 183, 196 n.83 (2003).*

*In its Title VI Manual, the Department of Justice ("DOJ") provides helpful definitions of the terms "recipient" and "beneficiary."*

*A complainant may bring a retaliation claim under Title VI or under a Title VI regulation that prohibits retaliation. For example, most agency Title VI regulations provide that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart." 28 C.F.R. § 42.108(e) (Department of Justice Regulation).*

**(a).    *U.S. Supreme Court Holds that Section 1981 Covers Retaliation Claims:***

*The U.S. Supreme Court agreed with the Seventh Circuit that section 1981 covers retaliation claims, including a retaliation claim based on one individual's concern for another's section 1981 rights. The Court's reasoning as follows: (a) in 1969, the Court's decision in Sullivan v. Little Hunting Park, Inc., 396 U.S. 299 (1969), recognized that section 1981's sister statute, 42 U.S.C § 1982, included retaliation claims; (b) the Court has long interpreted sections 1981 and 1982 alike; (3) in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the Court, without mention of retaliation, narrowed the scope of section 1981 by excluding post-contract-formation conduct, where retaliation would most likely be found; but subsequently, Congress*

*passed the Civil Rights Action of 1991, which superseded Patterson and explicitly defined the scope of section 1981 to include post-contract-formation conduct; and (4) since 1991, the lower courts have uniformly interpreted section 1981 as encompassing retaliation actions.*

**(b).**    ***Additionally, Sullivan and Its Progeny Imply a Private Right of Action Against Retaliation:***

*The Supreme Court has consistently treated retaliation against civil rights complainants as a form of intentional discrimination. The Court has held that "retaliation offends the Constitution [because] it threatens to inhibit exercise of the protected right" and "is thus akin to an unconstitutional condition demanded for the receipt of a government-provided benefit."*

*Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998) (citations and internal quotation marks omitted); see also Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 81 (D.D.C. 2003) (discussing Court's approach to retaliation in Crawford-El).*

*Specifically, the Court has interpreted 42 U.S.C. §§ 1982 and 1983 to bar retaliation against complainants or litigants even though these statutes do not contain explicit prohibitions against retaliation.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 277-87 1977). In 1969, the Supreme Court in Sullivan v. Little Hunting Park, held that § 1982 implicitly prohibits retaliation.*

## IV.    ESTABLISHING A *PRIMA FACIE* CASE OF RETALIATION

To establish a prima facie case of retaliation, the investigating agency must first determine if the complainant can show (**1**) that he or she engaged in a protected activity, (**2**) that the recipient knew of the complainant's protected activity, (**3**) that the recipient took some sort of adverse action against the complainant, and (**4**) that there was a causal connection between the complainant's protected activity and the recipient's adverse actions. See Davis v. Halpern, 768

F.Supp. 968, 985 (E.D.N.Y. 1991). (Defendants's summary judgment motion to dismiss Title VI retaliation claim was denied because my established evidence of prima facie case).

**Accordingly, I have shown that:** (**1**) I engaged in constitutionally protected activities indicating job discriminations at NIH/DHHS, and later at YSM, (**2**) the recipients knew of my protected activity or ought to have known via the internet or through personal contact with the current NIH high ranking officials whom I have directly accused as responsible persons for the discrimination at NIH, and the YSM- Genetics Department Chairman, Dr. Lifton not only received my YSM complaint of job discrimination and federal training grant abuse at his own department (see the Attached YSM confidential complaint), and additionally, he and all of the accused HMS- professors, such as, Dr. Morton, and Dr. Maas, and others at HMS are in close contact and friends with Dr. Lifton, and are also continuous recipients of NIH-Federal Govt. grant awards totaling several millions of dollars every year (data freely available from the NIH-grants website!), (**3**) the recipients took Continuing acts of adverse action against me for a prolonged period of time in an continuing manner **as an act of continuing retaliation** and (**4**) there is/ was a causal connection between my protected activity and the recipient's continuing adverse actions. *See Davis v. Halpern, 768 F.Supp. 968, 985 (E.D.N.Y. 1991). (**Defendants's summary judgment motion to dismiss Title VI retaliation claim was denied because he established evidence of prima facie case!**).*

Once a prima facie case of retaliation has been established, the investigating agency must then determine if the recipient can articulate a "legitimate non-discriminatory reason" for the action. Id. If the recipient can offer such a reason, the investigating agency must then show that

recipient's proffered reason is pre-textual and that the recipient's actual reason was retaliation. Id. A showing of pretext is sufficient to support an inference of retaliation. Id.

Given the continuing and reckless acts of alleged retaliation involving more than 6 dozen job applications at various grades/levels for a prolonged period of time at BWH (HMS) alone, in addition to numerous job applications within the other HMS-affiliated hospitals and around the country, it is relatively easy to show that recipient's proffered reason is pre-textual and that the recipient's actual reason was indeed retaliation. *Id. A showing of pretext is sufficient to support an inference of retaliation. Id.*

## V.    <u>CONTINUING VIOLATIONS DOCTRINE:</u>

The continuing violation doctrine permits a complainant to pursue alleged discriminatory acts that occurred outside the statutory period under Title VII. <u>**United States Supreme Court does recognize systemic violations, which involve the continuing policy or practice of discrimination on a company-wide basis, which policy or practice continues into the statutory period, as is alleged in this complaint.**</u> Further, *in National Railroad Passenger Corp. (Amtrak) v. Morgan,* 536 U.S. 101,122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court also left unresolved the issue of whether the continuing violation doctrine applies to systemic violations. However, ccontinuing violation doctrine been accepted, to varying degrees, in employment litigations. The Ninth Circuit permitted to recover for acts outside the limitations period as long as the acts represented an ongoing unlawful employment practice. *See, e.g., Anderson v. Reno,* 190 F.3d 930, 936 (9th Cir. 1999). The Supreme Court affirmed the Ninth Circuit in part, reversed in part and remanded the matter. The Supreme Court defined the

issue before it as "whether, and under what circumstances, a Title VII my may file suit on events that fall outside [the] statutory time period."

The Court, in a 5-4 split, viewed hostile environment claims differently than discrete discriminatory or retaliatory acts, noting that "[t]heir very nature involves repeated conduct." The Court held that a hostile environment claim generally does not occur on any given day, but rather occurs over a number of days or even years and is based on the cumulative effects of several acts. For that reason, the Court ruled that as long as one act contributing to the hostile environment claim occurs within the statutory period, a Title VII my may recover for the entire period of that hostile environment.

**Accordingly, I Invoke the Continuing Violations Doctrine / Continuing Claims Doctrine in my allegations of prolonged ceaseless and reckless retaliatory violations by Dr. Lifton on behalf of Yale School of Medicine, in accordance with the Continuing Violations Doctrine as defined by the U.S. Supreme Court in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).**

### E. PREVIOUS LAWSUITS

1. **Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action? Not yet begun.**

   a. Parties to previous lawsuit:

      Plaintiff (s):

      Defendant(s):

   b. Name and location of court and docket number:

c.  Disposition of lawsuit:

d.  Issues raised:

e.  Approximate date of filing lawsuit:

f.  Approximate date of disposition: not applicable.

2.  **If you have filed other lawsuits in this court in the last (10) years that are not related to the acts complained of in Part D, please list them:  None.**

## F.  REQUEST FOR RELIEF

**RELIEF:**

I seek relief in accordance with the laws and provisions cited below under the Remedies and Procedures, taking into consideration the continuing nature of the alleged reckless and ceaseless violations, as acts of continuing nature which falls under the "Continuing Violations Doctrine" for such a prolonged period of time, which has totally paralyzed my professional career, and has also irreversibly affected my personal life.

REMEDIES AND PROCEDURES:

The EEOC takes the position that all anti-discrimination laws provide for **compensatory as well as punitive damages for "illegal retaliation"**.

**Whenever discrimination is found, the goal of the law is to put the victim of discrimination in the same position (or nearly the same) that he or she would have been if the discrimination had never occurred (EEOC).**

**Additionally,  the US Supreme Court  has observed that it will recognize whatever remedies are necessary to effectuate a statutory right, because "the existence of a statutory**

right implies the existence of all necessary and appropriate remedies." *Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 69 (1992) (quoting Carey Piphus, 435 U.S. 247, 255 (1978))*; see also ***Chandamuri, 274 F. Supp. 2d at 81*** discussing Supreme Court's Franklin decision as supporting view that courts should provide remedies in retaliation cases.

The types of relief will depend upon the discriminatory action and the effect it had on the victim (EEOC).

**Accordingly,** I request the Court to compensate me for the emotional harm that I have suffered (such as mental anguish, inconvenience, or loss of the liberty and enjoyment of life), during this prolonged reckless retaliation and coercion by Dr. Lifton, in his official capacity as the Chairman of the Department of Genetics, Yale School of Medicine, and the Yale School of Medicine proper for having guided /allowed Dr. Lifton to retaliate against my candidacies at Harvard Medical School and around the nation in order to coerce me into taking up a position at his Clinical Cytogenetics laboratory in order to utilize me as a defense witness against the dismissed Middle Eastern professor who was planning to file a law suit alleging racial discrimination for his termination from the faculty position at Yale School of Medicine, if Dr. Pober was rehired, as she was also terminated from her Yale School of Medicine faculty position exclusively to deny the Middle Eastern professor a *prima facie* case of discrimination.

But when I refused to take up a position at YSM, Dr. Lifton, in his official capacity resorted to block each and every one of my professional clinical cytogenetics opportunities at Harvard Medical School and around the nation, as I had done my professional clinical cytogenetics- American Board of Medical Genetics (ABMG) – training at Dr. Lifton's Clinical Cytogenetics laboratory.

## G.  JURY DEMAND

**Do you wish to have a jury trial?  <u>Yes</u>.**

_____          _K. Syed Raj._

Original signature of attorney (if any)          **Plaintiff's Original Signature**

_____          SYED K · RAFI

Printed Name                                   Printed Name
                                               Syed K. Rafi
                                               P.O.Box 32302
                                               Kansas City, MO. 64171.
                                               <u>rafigene@yahoo.com</u>
                                               (617) 913 2953

## DECLARATION UNDER PENALTY OF PERJURY

I undersigned declares under penalty of perjury that Syed K. Rafi is the plaintiff in the above action, that he has read the above complaint and that the information contained in the complaint is true and correct.  28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at ___Kansas City, MO. 64171___ on ___Sept. 25, 2014___
                         (location)                              (date)

_____K. Syed Raj._____

**Plaintiff's Original Signature**

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Syed Rafi, PhD<br>P. O. Box 32302<br>Kansas City, MO 64171 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|
| **EEOC Charge No.**<br>523-2014-00509 | **EEOC Representative**<br>Charles H. Jordan,<br>Investigator | | **Telephone No.**<br>(617) 565-3195 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____
Feng K. An, JD
**Area Office Director**

JUL 2 3 2014
(Date Mailed)

Enclosures(s)

cc: **RESPONDENT REPRESENTATIVE**
Human Resources Director
YALE SCHOOL OF MEDICINE
333 Cedar Street
New Haven, CT 06510

*CONFIDENTIAL REPORT ABOUT PROF. QUMSIYEH THAT WAS DRAFTED BY ME PER YALE School OF MEDICINE CHAIRMAN, DR. RICHARD LIFTON' REQUIREMENT : SIGNED AND RECEIVED BY HIS SECRETARY.*

January 9, 2003

Richard P. Lifton, MD, Ph.D.
Chairman, Department of Genetics
Yale University School of Medicine
New Haven, CT. 06520

*RECEIVED AN EXACT COPY OF THIS REPORT FROM DR. S. RAFI, FOR DR. LIFTON (CHAIRMAN)*

Dear Chairman Lifton:

*SECRETARY'S SIGNATURE* ——→ x *Janet Budzinski*

*Dec. 10, 2003 3-30 pm*

As per your instruction I have drafted this detailed and verifiable report concerning my Clinical Cytogenetics training with Dr. Mazin B. Qumsiyeh, Director, Clinical Cytogenetics Laboratories at your esteemed Department. As you have assured me, I trust that this report will not be divulged to any other party and it is strictly meant for your personal information only.

I have undergone the American Board of Medical Genetics (ABMG) required 12 months of Clinical Cytogenetics training and the related Medical Genetics academic exposure at your Department, since I joined the Yale University School of Medicine on 8/13/2001, as per "a deal" offered by Dr.Qumsiyeh, to enable me to accomplish the required brief training at Yale, while working as a laboratory clinical cytogenetics technologist at his laboratory. In fact, Dr.Qumsiyeh "cornered me" into accepting his deal by blockading a better deal of a paid ABMG training fellowship offered by the Medical Genetics Center at the Boston University School of Medicine, Boston, MA, since I had to mention Dr.Qumsiyeh as one of the references for that candidacy. Consequently, Dr.Qumsiyeh intervened there to bring me to his Cytogenetics Laboratory at Yale, instead. After I joined Yale, I came to know through a fellow Post Doctoral trainee, Dr.Manju Nimakayalu, that since Dr.Qumsiyeh desperately needed an experienced cytogeneticist to manage his bone marrow cancer diagnostic cytogenetics section, he was bent upon bringing me to Yale, against my (as well as my mentor's) inclination to go to Boston University Medical Genetics Center, instead.

I was indeed very reluctant to join Dr.Qumsiyeh, since I have had previously interacted with him while he was at the Pathology Department, Duke University Medical Center, Durham, NC. I used to conduct some Fluorescent In situ Hybridization (FISH) research work and attend some medical genetics related meetings at Duke, while I was working at an independent Clinical Genetics Diagnostic establishment that had academic affiliation with the Duke University Medical Center. Probably due my very limited interaction with him at that time I did not perceive the depth of his involvement in his Palestinian political activism, and its adverse effect on his performance at the Duke Cytogenetics Laboratory. However, Dr.Qumsiyeh did often complain to me and to several other colleagues as well while he was at Duke, about Dr. Salvotore Pizzo's (Chairman, Dept. of Pathology at Duke) arrangement to have Dr. Qumsiyeh's clinical diagnostic work checked by another doctor before it could be divulged to a referring physician. But I do not know exactly what prompted Dr. Pizzo to take such a precautionary step against Dr.Qumsiyeh. Consequently, Dr.Qumsiyeh's relationship with the Chairman had deteriorated, and hence he had to prematurely leave Duke.

1

However, given the fact that: (1) Dr.Qumsiyeh had already blockaded my possibility of going to Boston University Medical Genetics Center for the training, (2) only a handful of Medical Genetics Centers are accredited by the American Board of Medical Genetics to offer the needed clinical cytogenetics training program, (3) the ABMG required training is meant to be brief (for only 12 months period; given my extensive clinical cytogenetics experience) and, (4) Yale has a long standing reputation of excellence in medical genetics, cumulatively enabled me to take the risk of doing the brief ABMG training with Dr.Qumsiyeh *(One of my college professors who taught me medical genetics in India had served as a faculty member at Dr. Leon E. Rosenburg's (the former Dean of Yale School of Medicine and  a noted Biochemical Geneticist) laboratory for  several years).*

However, as per Dr.Qumsiyeh's deal, I was also appointed as a Clinical Cytogenetic Technologist at the Clinical Cytogenetics Laboratory during the 12 months of ABMG training period, so as to enable me to work 7 hrs per day with pay, to financially support myself.  I over compensated for the time taken off to attend the training related academic activities, by working late until 10 or 11 pm on weekdays, a few hours on Saturdays and Sundays as well, without any additional payment.

Soon after I settled down at the Yale Clinical Cytogenetics Laboratory for the training, Dr.Qumsiyeh did not wait for too long to indirectly pressure me to attend his Palestinian political meetings and related activities in addition to my training related academic activities, and the laboratory work that extended often beyond 10pm.

Also, he and his fellow Palestinian activists began sending multiple emails almost on a daily basis, detailing the on going Palestinian activities to my email address, without my consent to do so (I still have retained a few of those emails in my inbox).  Then I came to know that there was a past history of similar email invitations from Dr.Qumsiyeh to, (1) Ms. Joan Samuelson (the Cytogenetics lab supervisor), (2) Dr. Manju Nimakayalu (Post Doctoral Fellow at that time) and, (3) several other former employees at the Cytogenetics laboratory as well.  To stop any more of those Palestinian political activity related emails, I sent an email reply to Dr.Qumsiyeh and his fellow Palestinian activists who had sent me those unauthorized emails, politely requesting them not to send me any such emails, saying that I am from India and hence have no interest whatsoever in taking part in any such non-academic activities.

When I met Dr.Qumsiyeh soon after that, he clearly registered his displeasure by being rude and authoritative in his dealings with me at the cytogenetics laboratory.  After a few days Dr.Qumsiyeh did not hesitate to extend an oral invitation to attend a Palestinian function that evening, which I evaded by saying that I was inundated with pending work at the laboratory.

Following that incidence, Dr.Qumsiyeh made me realize that as if he is doing a favor to me by enabling me to complete the ABMG training with him, and in return, I shall take part in his Palestinian political activities.

2

I discussed these developments with my laboratory supervisor, Ms. Joan Samuelson, Dr. Manjunath Nimakayalu (Manju) who was a post doctoral fellow at that time and, also with my mentor in New York (Dr. Qutub Qazi, MD, Ph.D, Emeritus Professor of Pediatrics and Medical Genetics at SUNY Down State Medical Center, Brooklyn, NY), who all concurred with my decision not to yield to Dr. Qumsiyeh's coercive unethical demands at the work place. Manju told me that he also had to face Dr.Qumsiyeh's displeasure when he refused to succumb to Dr. Qumsiyeh's coercion to take part in his Palestinian political activities. Manju was also subjected to almost daily humiliation and consistently over-burdened laboratory work. Ms. Joan Samuelson also narrated Dr. Qumsiyeh's unethical and coercive behavior at the laboratory, his fanatically dedicated Palestinian political activism at the work place and its adverse effect on the quality of work, service, and personnel at the laboratory.

Since then, Dr.Qumsiyeh insisted that I should stay beyond 10pm to do additional diagnostic lab work to over-compensate for the time taken off to attend the training related academic activities, which I agreed to do so. However, the very next day, Dr.Qumsiyeh asked me to sign my own resignation of the full time technologist position at the laboratory, which I did as per his insistence. Immediately after that event, he consoled me by showing a document that indicated that my lab work position will continue as a "temporary" technologist instead, with the same pay scale, meaning that he has deprived me *("and thus punished me")* of my Yale medical insurance coverage and other benefits as well, that were part of the original job offer.

However, since the "temporary" technologist position still monetarily enabled me to continue with my ABMG training, and neither did I come to Dr. Qumsiyeh's laboratory anticipating a suitable pay or income (that is comparable to my qualifications and prior extensive clinical cytogenetics experience) during the brief (12 months of) training period, nor did I wish to continue to associate with Dr. Qumsiyeh after the completion of the training period, I decided to continue with my training unhindered for the rest of the eight months period, although totally deprived of the Yale medical insurance coverage and other benefits.

Notwithstanding, tauntingly, at the same moment, Dr.Qumsiyeh also told that he had decided to award an available senior post doctoral fellowship position (which he was contemplating and ought to have given it to me, or to any other qualified candidate), to a "foreign" doctor who had just come to his lab, on her own financial support, just to spend a year at Yale learning medical genetics and cytogenetics. She also clearly lacked any prior research experience in genetics to qualify for that senior genetic research fellowship award (You may verify this with Prof. David Ward, Manju and, Ms. Joan Samuelson).

We all at the laboratory "concurred" that it was clearly her and her unemployed husband's unflinching willingness to participate in Dr.Qumsiyeh's Palestinian activism related activities at the laboratory itself and also accompanying him to attend his political engagements outside, that gave her the qualifications needed to receive that senior research fellowship award from Dr.Qumsiyeh. In fact, she and her unemployed husband

3

had made the research cytogenetics laboratory room as their day and evening time dwelling place so that they could be very next door to Dr. Qumsiyeh.

In general, you may verify all of these incidences and allegations with, (1) the cytogenetics laboratory supervisor, Ms. Joan Samuelson (2) Dr. Manju Nimakayalu, a former post doctoral fellow at that time and, (3) Prof. David Ward at the Yale Genetics Department, since Dr. Ward's former student was a post doctoral fellow at the cytogenetics laboratory during this period and, Dr. Ward himself had close interactions with Dr.Qumsiyeh pertaining to his over-lapping research interest.

However, now, after having so faithfully and diligently completed more than the needed 12 months (August 13, 2001 to January 13, 2003: 17 months) of clinical cytogenetics training with Dr. Qumsiyeh at the Yale ABMG Medical Genetics training program, while also simultaneously attending all of the weekly medical genetics academic activities pertaining to the training program *(such as: Tuesday (8.30 am to 9.30 am) cancer genetics seminars at Fitkin, Tuesday (9.30 am to 10.30 am) genetics lectures at SHM, Tuesday (10.45 am to 11.45 am) medical genetics presentations at SHM, Tuesday (1pm to 2pm) lymphoma clinical conference at YNHH), Tuesday (2pm to 3pm; biweekly) clinical cytogenetics laboratory case presentations and cytogenetics lab management meetings, and Tuesday (3pm to 4pm) post clinic clinical genetics case presentations at SHM, and Tuesday (4pm to 5pm) genetics lectures at SHM; Wednesday (1pm to 2pm) clinical cytogenetics meetings at WWW, Friday (1pm to 2.30pm) Hemato-pathology case history and genetics discussions at YNHH; having published two peer reviewed research papers from Yale cytogenetics laboratory; and having taken part in all aspects of the Yale diagnostic cytogenetics laboratory work including the clinical diagnostic cytogenetic analysis of peripheral blood chromosomes for constitutional abnormalities, leukemia and lymphoma bone marrow / blood cytogenetic analysis, clinical molecular cytogenetic analysis (FISH) for detecting constitutional deletions / duplication syndromes, chromosomal aneuploidies; bone marrow FISH analysis for fusion genes, gene deletions and chromosomal aneuploidies; and amniocytes FISH analysis for prenatal diagnosis of chromosomal aberrations; having regularly attended the cytogenetics (amniocentesis, chorionic villus sampling (CVS), blood, bone marrow and solid tumors) case presentations; and also having carefully studied and verified the daily out-going cytogenetics analysis reports during more than the 12 months of ABMG training period at the Yale Clinical Cytogenetics laboratory),* "I should be certified as such, as having completed the required 12 months of ABMG clinical cytogenetics training during my 17 months of training period at the Yale ABMG accredited medical genetics training program".

As per Dr. Allen Bale's recent email response to me pertaining to the completion of my brief (12 months) ABMG clinical cytogenetics training, indicating Dr. Qumsiyeh's intention to impart further cytogenetics training to me in order to complete my training, I would like to state that I am an already fully trained Clinical Cytogeneticist, having successfully served as Director of two Clinical Cytogenetics Laboratories elsewhere, and with more than a decade of clinical cytogenetics experience and medical genetics exposure, and hence Dr.Qumsiyeh ought not to "unnecessarily" stretch my training

period any longer.   There remains nothing tangible for me to acquire during the proposed additional training with Dr.Qumsiyeh, as has been indicated in Dr.Bale's recent email response to me.   Acknowledging my extensive clinical cytogenetics experience, the ABMG itself mandated only a brief (12 months) additional training at an ABMG accredited training program.

However, having already spent a total of 17 months at Yale, instead, I am *"politely willing"* to spare more time during the next 2 months period (until March 12, 2003), daily from 5.00 pm to 8.00 pm (Monday through Friday), "strictly" for the following additional training purpose: (1) To compile my cytogenetics case log book for the ABMG, since I joined the program in August 2001, (2) to review some previous abnormal case files, (3) to write cytogenetic diagnostic reports of new abnormal cases (7.00 pm to 8.00 pm; since that is the time Dr.Qumsiyeh usually writes the cytogenetic diagnostic case reports, collectively) and, (4) to spend some more time at the prenatal cytogenetics section with the lab supervisor, Ms. Joan Samuelson.  During this additional 2 months training period, I will also be attending most of the medical genetics / cytogenetics related academic activities, as listed above, "while being employed elsewhere during the daytime, to sustain myself".  At the end of the additional 2 months of training I would have spent a total of 19 months at Yale to complete the needed 12 months of brief ABMG training.

Since Dr.Qumsiyeh's ongoing Palestinian political activism consumes a major chunk of his day time at his Office at the cytogenetics laboratory (responding to some 200 emails that he boasts about receiving every day from his fellow Palestinian political activists, tenaciously maintaining an international email registry of fellow Palestinian activists with some ten to fifteen thousand email addresses, constantly monitoring the ongoing situation in the Middle East via internet, writing text-books on the subject of Middle East conflict, frequently writing newspaper articles on the subject and giving TV interviews, organizing local, national, and inter-national meetings and demonstrations concerning Palestinians, printing and distributing newsletters, ceaselessly and obsessively inviting (even coercing) people to participate in those meetings and demonstrations, frequently engaging in telephone conversations with his fellow activists and, staying late at the Office in order to accomplish these tasks), he resorts to coercing post doctoral trainees such as myself into doing his part of the laboratory / administrative work as well, disguised as training / additional training (You may verify this with Ms. Joan Samuelson, the laboratory Supervisor and, Manju, a former post doctoral fellow).

Dr. Qumsiyeh also exhibits an inherent sense of loyalty towards his subordinates if he/she is willing to get involved in his Palestinian political activism related activities as well.  Based on this criterion, he judges his subordinates as friendly / loyal, and rewards them abusing his authority as the laboratory Director, while he turns confrontational / hostile and, even vindictive towards the unfriendly / disloyal, again abusing his authority. To cover-up the abuse of his authority, he premeditatedly plans to rationalize his unjust actions.

It is true that at the very beginning of my training I was very much interested in establishing a viable Preimplantaion Genetics Diagnostic (PGD) Service at Yale in collaboration with the Obstetrics & Gynecology Department. To that effect, I also met and discussed this matter several times with Dr. Erwin Jones, Director, Yale In-vitro Fertilization Center and, with Dr. Huszar, Director of Yale Sperm Physiology Laboratories, seeking their help to do so. They both were very eagerly and positively responsive to my proposal.  However, after having come to realize the unpalatable and unethical selfish nature of Dr.Qumsiyeh, I have no interest now to pursue it at his Cytogenetics Laboratory; since now I have come to abhor any chance of being associated with Dr.Qumsiyeh any longer than what is absolutely required for the successful completion of my training.

Moreover, there is absolutely no need for me to work under / collaborate with Dr.Qumsiyeh, since I am better capable of accomplishing any such goal on my own, while directing my own clinical cytogenetics laboratory, as I have done in the past.

In the pretext of imparting additional training, he has already begun indirectly coercing me into establishing the technically demanding preimplantation cytogenetics / molecular FISH diagnostic procedures, instead of completing my brief 12 months of ABMG required training, so that I will be in a position to seek a paying position elsewhere.  The establishment of the PGD procedure with my (coerced) efforts and technical skills will only serve as a shield in the hands of Dr.Qumsiyeh for defending himself against any criticism of his unethical ceaseless political engagements at the work place and its detrimental effect on the laboratory performance.

I regret to mention here that since Dr.Qumsiyeh lacks his hand coordination and dexterity (that often leads to spillage of the blood specimen when he tries to establish a culture), and also suffers from partial color blindness (which makes it difficult for him to confidently distinguish some of the diagnostic FISH probe color signals), he has to constantly rely upon post doctoral trainees to help him out (you may verify this with the laboratory Supervisor, Ms. Samuelson, and Manju).

Dr.Qumsiyeh certainly has a history of coercively manipulating post doctoral trainees to get done a lot more than their fair share of the routine diagnostic cytogenetic laboratory work as well in the pretext of training, without any reimbursement to them, so that he could deceptively demonstrate an enhanced cost-effectiveness of his diagnostic cytogenetic laboratory operation (you may verify this with Manju and Ms. Joan Samuelson).

Hence, there is no doubt that Dr.Qumsiyeh's intention to impart further cytogenetics training to me "is a definite pretense" on the part of Dr.Qumsiyeh to further exploit my technical skills freely, as he is known to do so.

Given Dr.Qumsiyeh's tendency to blockade any advancement opportunities of those who come to rely upon him for any training purpose and, be vindictive to those who try to resist his unethical exploitation and suppression, he should submit an open

6

undated letter to me, addressed to the ABMG, clearly indicating my successful completion of the ABMG Cytogenetics training at Yale during the estimated total 19 months of the training period.

Much more appropriate and reassuring would be the designation of Dr. Barbara Pober (an ABMG certified Cytogeneticist & Clinical Geneticist, Associate Professor of Genetics & Pediatrics, who was directing the Yale Cytogenetics Laboratory prior to Dr. Qumsiyeh's take over; who is a current board member of the Cytogenetics Laboratory, and who in the absence of Dr. Qumsiyeh last week, Wednesday through Friday, was signing out the reports of cytogenetic diagnosis), as my Clinical Cytogenetics training Director exclusively for the ABMG purpose, to save me from the wrath of Dr.Qumsiyeh; since mentioning Dr.Qumsiyeh as my training director means that he definitely will be contacted as a mandatory reference, by any prospective employer who would like to employ me to direct a clinical diagnostic cytogenetics laboratory after the completion of this training, and at that moment Dr.Qumsiyeh will certainly be ruthlessly lethal, as we all know him to be a remorselessly revengeful person.

However, as per your assurance to me, *please* let this information NOT serve as the basis of any adverse / direct action against Dr.Qumsiyeh at this critical juncture of my training period, since it will certainly affect the certification of my training as duly completed, and also jeopardize my job prospect.  So, the sole purpose of this elaborate report to you at this juncture is to enable you to *"only indirectly"* verify and monitor, and to bring forth *"only indirect"* subtle pressure on Dr. Qumsiyeh (exclusively through Dr. Allen Bale, who is very willing and in a position to interject in ABMG matter), so as to have my ABMG clinical cytogenetics training (which I have undergone so diligently, as has been documented in this report), certified as successfully completed at the Yale School of Medicine during the estimated 19 months period.

Before I conclude, I humbly request you again, to *immediately* consider me for any available position at your laboratory *(I am already conversant / exposed to most of the molecular genetic technologies as a Visiting Scientist for more than a year at the North Carolina State University's Genome Center prior to joining Yale)*, so as to enable me to sustain.  The molecular genetics research experience will certainly be a pertinent adjunct to the ABMG training as well.

Thank you in anticipation and with best regards.

Sincerely,

*(signature)*

Syed K.Rafi, Ph.D.
POB 206644, Yale University Station
New Haven, CT. 06520-6644
rafigene@yahoo.com
Tel: 526 6649

7





**Careers Home      Job Search      My Saved Jobs      My Saved Searches      My Career Tools      Logout**

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,, MO 64111
UNITED STATES
Edit Profile

My Applications

Display applications from:  All Applications                    ▾    Refresh

◀◀ First   ◀ Previous     Next ▶  Last ▶▶

Applications In Progress

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| MOLECULAR DIAGNOSTIC TECH I / 40 HOURS / DAY / BWH - CAMD MOLECULAR LAB | Applied | 03/15/2014 9:30PM | Hold |
| TECHNICAL RESEARCH ASSISTANT I / 40 HOURS / DAY / BWH - PCPGM | Applied | 03/15/2014 9:30PM | Filled/Clo |
| TECHNICAL RESEARCH ASSISTANT I / 40 HOUR / DAY / BWH - CENTER FOR PERSONALIZED GENETIC MEDICINE | Applied | 03/15/2014 9:30PM | Filled/Clo |
| RESEARCH ASSISTANT II / 40 HOUR / DAY / BWH - MEDICINE/GENETICS | Applied | 03/15/2014 9:30PM | Open |
| PROJECT MANAGER / 40 HOUR / DAY / BWH - CARDIOVASCULAR MEDICINE | Applied | 03/15/2014 9:45PM | Canceled |

Resumes

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008,_June--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008,_August--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE-_October,_2010.doc | CURRICULUM_VITAE-_October,_2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

Attachments

You have not added any attachments

New Window     http

**Careers Home**    **Job Search**    **My Saved Jobs**    **My Saved Searches**    My Career Tools    **Logout**

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,. MO 64111
UNITED STATES
Edit Profile

My Applications

Display applications from: All Applications ▼    Refresh

🔆First | 🔅Previous | Next🔅 | Last🔆 🔆

Applications In Progress

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| TECHNICAL RESEARCH ASSISTANT I / 40 HOURS / DAY / BWH - PCPGM | Applied | 02/13/2014 7:52PM | Filled/Clo |
| TECHNICAL RESEARCH ASSISTANT I / 40 HOUR / DAY / BWH - CENTER FOR PERSONALIZED GENETIC MEDICINE | Applied | 02/13/2014 7:52PM | Filled/Clo |
| SENIOR TECHNICAL RESEARCH ASSISTANT / 40 HOUR / DAY / BWH - CENTER FOR PERSONALIZED GENETIC MEDICINE | Applied | 02/18/2014 7:20PM | Canceled |
| FISH CYTOGENETIC TECH II / 40 HOURS / VARIABLE-DAYS / BWH - CYTOGENETICS LABORATORY | Applied | 03/10/2014 10:19PM | Filled/Clo |
| CYTOGENETIC TECHNOLOGIST II / 14 HOURS / DAY / BWH - CYTOGENETIC LAB | Applied | 03/10/2014 10:19PM | Open |

Resumes

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008,_June--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008,_August--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE-_October._2010.doc | CURRICULUM_VITAE-_October._2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

New Window    http

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,, MO 64111
UNITED STATES
Edit Profile

### My Applications

Display applications from: All Applications  ▼   Refresh

First   Previous   Next   Last

Applications in Progress

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| SENIOR CYTOGENETIC FISH TECHNOLOGIST / 40 HOURS / DAYS - BWH CYTOGENETICS LAB | Applied | 05/30/2013 10:29PM | Filled/Clo |
| TECHNICAL DIRECTOR / 40 HOURS / DAYS - BWH CYTOLOGY | Applied | 05/30/2013 10:29PM | Filled/Clo |
| TECHNICAL RESEARCH ASSISTANT I / 40 HOUR / DAY / BWH - PATHOLOGY | Applied | 08/24/2013 10:20PM | Filled/Clo |
| PROJECT MANAGER / 40 HOUR / DAY / BWH - OB/GYN | Applied | 08/25/2013 11:21PM | Filled/Clo |
| TECHNICAL RESEARCH ASSISTANT I / 40 HOUR / DAY / BWH - PATHOLOGY | Applied | 08/26/2013 12:41AM | Filled/Clo |

### Resumes

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008, June-- CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008, August-- CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE- October. 2010.doc | CURRICULUM_VITAE-_October._2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

### Attachments

You have not added any attachments

Add Attachment



New Window    http

**Careers Home**    **Job Search**    **My Saved Jobs**    **My Saved Searches**    My Career Tools    **Logout**

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,, MO 64111
UNITED STATES
Edit Profile

### My Applications

Display applications from: All Applications ▾    Refresh

First    Previous    Next    Last

**Applications In Progress**

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| CMD COORDINATOR / 40 HOURS / ROTATING - BWH PATHOLOGY | Applied | 11/13/2012 9:27PM | Filled/Clo |
| RESEARCH ASSOCIATE / CHANNING DIVISION OF NETWORK MEDICINE | Applied | 11/13/2012 9:48PM | Canceled |
| RESEARCH LAB MGR, SR / 40 HOURS / DAYS / BWH CHANNING LABORATORY | Applied | 11/13/2012 9:55PM | Canceled |
| RESEARCH ASSISTANT II / 40 HOUR / DAY / BWH - MEDICINE/GENETICS | Applied | 05/30/2013 10:03PM | Open |
| CMD COORDINATOR / 40 HOURS / DAYS - BWH PATHOLOGY | Applied | 05/30/2013 10:29PM | Filled/Clo |

### Resumes

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008,_June--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008,_August--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE-_October,_2010.doc | CURRICULUM_VITAE-_October,_2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

### Attachments

You have not added any attachments

 Add Attachment

🖵 New Window   🖳 http

**Careers Home**    **Job Search**    **My Saved Jobs**    **My Saved Searches**    My Career Tools    **Logout**

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,, MO 64111
UNITED STATES
Edit Profile

My Applications

Display applications from: All Applications ▼   Refresh

🔲 First   🔲 Previous   Next 🔲   Last 🔲

Applications In Progress

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| CYTOGENETIC ASSISTANT / 20 HOURS / DAYS - BWH CYTOGENETICS LAB. | Applied | 08/07/2012 11:37PM | Canceled |
| CYTOGENETIC TECH II / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS | Applied | 08/22/2012 11:53PM | Canceled |
| CYTOGENETIC ASSISTANT / 40 HOURS / EVENINGS - BWH CYTOGENETICS LAB. | Applied | 08/23/2012 12:02AM | Filled/Clo |
| CYTOGENETIC ASSISTANT / 20 HOURS / DAYS - BWH CYTOGENETICS LAB. | Applied | 08/23/2012 12:09AM | Canceled |
| CYTOGENETIC ASSISTANT / 40 HOURS / EVENINGS - BWH CYTOGENETICS LAB. | Applied | 08/28/2012 11:08PM | Filled/Clo |

Resumes

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008,_June--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008,_August--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE-_October,_2010.doc | CURRICULUM_VITAE-_October,_2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

Attachments

 New Window 📠 http

**Careers Home**    **Job Search**    **My Saved Jobs**    **My Saved Searches**    My Career Tools    **Logout**

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,, MO 64111
UNITED STATES
Edit Profile

**My Applications**

Display applications from: All Applications ▾    Refresh

First   Previous   Next   Last

Applications In Progress

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| CYTOGENETIC TECH II / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS | Applied | 05/29/2012 11:59PM | Canceled |
| CYTOGENETIC TECH II / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS | Applied | 07/01/2012 2:15AM | Canceled |
| CYTOGENETIC TECH II / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS | Applied | 07/01/2012 2:15AM | Canceled |
| CYTOGENETIC ASSISTANT / 40 HOURS / DAYS - BWH CYTOGENETICS LAB. | Applied | 08/07/2012 11:37PM | Filled/Clo |
| CYTOGENETIC TECH II / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS | Applied | 08/07/2012 11:37PM | Canceled |

**Resumes**

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008,_June--_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008,_August-_CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE-_October._2010.doc | CURRICULUM_VITAE-_October._2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

**Attachments**

New Window    http

## My Career Tools

SYED RAFI
P.O.BOX. 32302
WESTPORT ROAD
KANSAS CITY,, MO 64111
UNITED STATES
Edit Profile

### My Applications

Display applications from:  All Applications    ▼    Refresh

First    Previous    Next    Last

#### Applications In Progress

| Application | Application Status | Application Date | Job Opening Status |
|---|---|---|---|
| PROJECT MANAGER / 40 HOUR / DAY / BWH DEPT. OF GENETICS | Applied | 12/14/2011 7:51PM | Filled/Clo |
| CYTOGENETIC TECH, SR / 40 HOURS / DAYS - BWH PATHOLOGY-CYTOGENETICS. | Not Applied | 05/28/2012 1:22AM | Filled/Clo |
| CYTOGENETIC TECH, SR / 40 HOURS / DAYS - BWH PATHOLOGY-CYTOGENETICS. | Applied | 05/29/2012 11:36PM | Filled/Clo |
| CYTOGENETIC TECH II / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS | Applied | 05/29/2012 11:59PM | Canceled |
| CYTOGENETIC TECHNOLOGIST I / 40 HOURS / DAYS - BWH PATHOLOGY - CYTOGENETICS LABORATORY | Applied | 05/29/2012 11:59PM | Filled/Clo |

### Resumes

| Resume Title | Attached File | Created |
|---|---|---|
| Converted Resume | | 12/26/2007 12:00AM |
| 2008, June-- CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 06/11/2008 9:15PM |
| 2008, August-- CURRICULUM_VITAE.doc | 2008,_June--_CURRICULUM_VITAE.doc | 08/14/2008 7:28PM |
| CURRICULUM_VITAE- October. 2010.doc | CURRICULUM_VITAE-_October._2010.doc | 10/18/2010 10:03PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/29/2012 11:41PM |
| SYED K. RAFI CURRICULUM VITAE | | 05/30/2012 12:03AM |

### Attachments