# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SYED K. RAFI.                    :
*Plaintiff*                      :
                                 :
**v.**                           :          **Case No. 3:14-CV-01582 (VAB)**
                                 :
YALE UNIVERSITY                  :
SCHOOL OF MEDICINE &             :
RICHARD P. LIFTON.               :
*Defendants*                     :


**I.**  **APPELLANT'S SPECIFIC RESPONSE TO DISTRICT COURT'S RULING (*ECF # 78, PAGE 27-29*) CONCERNING HIS CLAIMS UNDER SECTION 1983.**

As the District Court has correctly pointed out, plaintiff has requested "appropriate equitable relief against the defendants as allowed by …42 U.S.C. § 1983." *(see, Renewed Complaint at 35, ECF # 51; also see, (1) ECF # 68, pages 14 through 34: Plaintiff's Second Response-Effectively Rebutting Defendants' Arguments (contained in ECF # 65) Pertaining To Plaintiff's Claim Under 42 U.S.C. § 1983;* and *(2)  ECF # 63, pages 33 through 36, item XI: Plaintiff's Response To Defendants Statement That "Plaintiff's Claims Under 42 U.S.C. § 1983 Should be Dismissed Because Plaintiff Has Not Alleged Any State Action*),

But, unfortunately, the District Court has failed to consider in earnest plaintiff's request for "appropriate equitable relief against the defendants as allowed by …42 U.S.C. § 1983- under any of the criteria or facts per the Supreme Court's description in Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001).

 Section 1983 functions as an enforcement tool for retaliation while acting under color of law.  In Vega v. Hempstead Union Free Sch. Dist., 127 FEB 1661 (2nd Cir. 2015), the court held that the plaintiff, a teacher  in the defendant school district, could bring a retaliation claim under Section 1983 against  the supervisor who, acting under the color of law, retaliated against him for

opposing discrimination (based on his ethnicity) in the terms of his employment. In Hill v. City of Pine Bluff, 696, F. 3d 709, 116 FEB 407 (8TH Cir. 2012), the court recognized that retaliation claims may be brought under Section 1983, (also see, Dougherty v. Barry, 604 F. Supp. 1424, 37 FEB 1169 (D.D.C. 1985).

1. **42 U.S.C.§ 1983: Plausible "State Actor"- Status Claim For The Defendants Based On The State Of Connecticut's "Pervasive Entwining", "Joint Enterprise", "Symbiotic Relationship", And "A Vital Public Function"- CITERIA AND FACTS.**

It should be noted that plaintiff- appellant has NOT tried to seek remedy under 42 U.S.C.§ 1983 without extensively arguing in favor of plausible "State Actor"- status for the defendants, Yale School of Medicine and Dr. Lifton (*see, ECF # 68, pages 14 to 34*). It should be emphasized that the defendants in this case are Yale School of Medicine (YSM) and Dr. Richard Lifton. Yale University *per se* has not been named as the defendant. <u>Therefore, the relevant question here is whether YSM could be considered as a "State Actor" for the purpose of plaintiff's Section 1983 claims in this case.</u>

It is apparent that the District Court has opted to favor the defendants by very superficially narrating that YSM – "*works closely with the Connecticut Mental Health Center*"….(*ECF # 78, page 27, para 3, line 3*), while plaintiff has evidenced (1) intrinsically direct and permanent involvement of the State of Connecticut with YSM-Connecticut Mental Health Center (*see ECF # 68, page 17, # IX; also see, pages 27, para 2, through page 28, para 3*), (2) direct long-lasting and on-going State Government's engagement and collaboration with Yale medical school to enable state-wide delivery of mental health and addictions services, (3) State dictating and/or influencing of YSM's administration and its faculty, and (4) State

legislature demanding more from Yale (See, *ECF # 68, pages 14 (XI) thro' 28 (para 3); also See Exhibits # 9 &12, therein; also See, ECF # 64: Exhibits # 4 & 5 therein*).

As has been effectively rebutted before by plaintiff (*see, ECF # 68, pages 29-34*), District Court's concluding statement in its ruling (*ECF # 78, page 27, para 3, lines 5 through' page 28, para 2, line 2*) referring to *Porter v. Morris, 2011 U.S. Dist. LEXIS 78060 *3-4 (D.Conn. July 19, 2011…"*(*finding that Yale New Haven Hospital is not a "State Actor" for Section 1983 purposes based on its receipt of state funding).*", has no relevance, since plaintiff is NOT exclusively hinging his "State Actor" claim based on defendant's receipt of state funding, given his claim is based on a wide ranging and intrinsic involvement of the state, as has been presented in detail above, as well as in his earlier response in *ECF # 68* (*pages 29, para 2 through' page 34, para 1*). To reiterate, briefly, the "State Actor" claim is expansively also based on"

(1) **The State of Connecticut's "pervasive entwining"** with the leadership of the Yale University and with its School of Medicine *per se (See, Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002)); (See, ECF # 68, pages 14 (XI) thro' 28 (para 3));*

(2) The State of Connecticut's long-standing and on-going "**joint enterprise**" and "**symbiotic relationship**" with YSM and its University (*See, Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)); (See, ECF # 68, pages 14 (XI) thro' 28 (para 3); also See Exhibits # 9 &12, therein; also See, ECF # 64: Exhibits # 4 & 5 therein; also See,* **http://www.psychiatry.yale.edu);**

(3) YSM in the service of delivering public health education and health care at the state level, **"a vital public function", (See,** *Marsh v. Alabama, 326 U.S. 501 (1946)),*

*and thus, far and beyond satisfying the federal judiciary's nearly unanimous requirement of MORE involvement of State, in addition to (mere) financial assistance to a private university or professional school, to render the actions of the institution state action for purposes of § 1983, per Defendants' own statement (as quoted above) quoting from Huff v. Notre Dame High School,*

*456 F.Sup. 1145, 1148 (D. Conn. 1978) (Burns, J.)"*. (See, ECF # 68, Exhibit # 14, therein: page 3, paragraph 3, *Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D.Conn.1978)*).

However, in the case of *Porter v. Morris, 2011 U.S. Dist. LEXIS 78060 *3-4 (D.Conn. July 19, 2011)*, as the Judge has additionally alluded to, referring to Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L. Ed.2d 482 (1982), that under the second part of the test to determine when the actions of a private party may be attributed to the state so as to make the private party subject to liability under section 1983, the party ……..."*or obtained aid from state officials*"..,  (*See, Exhibit # 15, in ECF # 68, page 1, last paragraph; and page 2, paragraph 1*).

As the Judge in this case has correctly pointed out, Yale New Haven Hospital is "not a State facility".  The New Haven Hospital is also unconnected in any way with the Yale University, but the Yale School of Medicine utilizes this facility only for its clinical training purposes.

Further, the Judge has only passingly indicated that "Yale New Haven Hospital is affiliated with Yale University and Yale University School of Medicine," perhaps indicating that YNHH is not affiliated to a State entity *per se* instead (*See, Exhibit # 15, herewith: page 2, paragraph 2; lines 1 & 2*).

It is important to note that Plaintiff, Porter did NOT even try to establish that the Defendants *per se*, collectively or individually, obtained any aid from State Officials, in order to establish his claim under the second part of the test, in accordance with Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L. Ed.2d 482 (1982),

to determine the actions of a private party may be attributed to the state so as to make the private party subject to liability under section 1983.  This is evident from the Judges remark that,

"Plaintiff alleges no facts to suggest that any defendant satisfies the requirements to be considered a state actor or is acting pursuant to any right created by the State of Connecticut". Thus, none of Plaintiff's claims are cognizable under section 1983."(*See, Exhibit # 15, herewith: page 2, paragraph 2; lines 2 to 4*).

However, there is no room whatsoever even to suggest that Judge Droney made any determination with or without any allegation by Plaintiff in this case indicating that YNHH-affiliates, Yale University or Yale School of Medicine obtained significant aid from state officials, and therefore they are to be considered state actors.

Therefore, District Court's extrapolation (*See, ECF # 65, page 7, paragraph 2*) of Judge Droney's passing statement that, "Yale New Haven Hospital is affiliated with Yale University and Yale University School of Medicine."—meaning it to be a judgment *per se* on the status of Yale School of Medicine "as non-State actors"- is wrong, given Judge Droney's clear remark that, "Plaintiff (Porter) alleges no facts to suggest that any defendant satisfies the requirements to be considered a state actor or is acting pursuant to any right created by the State of Connecticut"(*See, Exhibit # 15, in ECF # 65, page 2, paragraph 2; lines 2 & 3*).

Unlike in *Porter v. Morris,* Plaintiff in this case has alleged facts that support his claim that Defendants in this case, YSM and Dr. Lifton, are to be considered as State actors, given that Plaintiff in this case, "does NOT merely hinging on the State as well as Federal financial assistance (XII through XVI, above) to defendants to stake his claim that YSM, and Dr. Lifton, are indeed State Actors", but has indeed irrevocably based his claim on "MANY MORE EVIDENCING, as has been extensively presented and argued by plaintiff in his second response, *ECF # 68, pages 14 (XI) thro' 34*), which additionally affirm:

1.  Direct and intimate State Government's involvements in the very establishment of YSM as well as Yale University (The medical school (YSM) was in fact chartered by

an act of the Connecticut State Legislature in 1810
(http://www.columbia.edu/~mdt1/Yalehistory.pdf).

2. State's continued *ex-officiis*- governance up to this time;
3. Direct long-lasting and on-going State Government's engagement  and intrinsic collaboration with Yale medical school to enable state-wide delivery of mental health and addictions services;
4. State dictating and/or influencing of YSM's administration and its  faculty;
5. State legislature demanding more from Yale; and
6. State of Connecticut ownership of the annual "Connecticut Open"  tennis **tournament** at the Connecticut Tennis Center at Yale University—

**-----**not only in accordance with United States Supreme Court decisions in *Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L. Ed.2d 482 (1982), but additionally, satisfying varied requirements in additional United States Supreme Courts' decisions in Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002); Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961); and Marsh v. Alabama, 326 U.S. 501 (1946), further, in accordance with the federal judiciary's nearly unanimous requirement of MORE involvement of State, in addition to (mere) financial assistance to a private university or professional school, to render the actions of the  institution state action for purposes of § 1983, per Defendants' own statement (as quoted above) quoting from Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D. Conn. 1978) (Burns, J.)".* (See, *ECF # 68, Exhibit # 14, page 3, paragraph 3, Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D.Conn.1978)).*

As emphasized above, the defendants in this case are Yale School of Medicine (YSM) and Dr. Richard Lifton.  Yale University *per se* has not been named as the defendant.  Therefore, the most relevant question here is whether YSM *per se* could be considered as a "State Actor" for the purpose of plaintiff's Section 1983 claims in this case.  Given evidencing and arguments in ECF # 68 (*page 15, para 1, thro' page 23, para 3)*, for:

(1) **The State of Connecticut's** "**pervasive entwining**" with the leadership of the Yale University and with its School of Medicine *per se (See, Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002))*; (*See, ECF # 68, pages 14 (XI) thro' 28 (para 3));*

(2) The State of Connecticut's long-standing and on-going "**joint enterprise**" and "**symbiotic relationship**" with YSM and its University (*See, Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)*); (*See, ECF # 68, pages 14 (XI) thro' 28 (para 3); also See Exhibits # 9 &12, therein; also See, ECF # 64: Exhibits # 4 & 5 therein; also See,* **http://www.psychiatry.yale.edu**)**;** and

(3) YSM in the service of delivering public health education and health care at the state level, **"a vital public function"**, **(See,** *Marsh v. Alabama, 326 U.S. 501 (1946)),*
it is clear that YSM could be construed as a "State Actor".

**Thus, the evidencing and arguments** *(ECF # 68, pages 14 (XI) thro' 28 (para 3); also See Exhibits # 9 &12, therein; also See, ECF # 64: Exhibits # 4 & 5 therein)* in favor of assigning "State Actor" status to YSM, are in accordance with United States Supreme Courts' decisions in *Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002)*; *Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)*; *and Marsh v. Alabama, 326 U.S. 501 (1946), as well as in accordance with* the US Supreme Court decisions in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L. Ed.2d 482 (1982), and *Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D. Conn. 1978) (Burns, J.)". (See, ECF # 68, Exhibit # 14, page 3, paragraph 3, Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D.Conn.1978)).*

The District Court has opted to argue *(ECF # 78, page 28, para 2)*, quoting the Supreme Court decision in *Lebron v. Nat'l R.R.Passenger Corp.,* 513, U.S. 374 (1995), as if "*one size fits all*" for the purpose of establishing that a private institution is sufficiently connected to government actors to convert the entity into a government actor for purposes of Section 1983

liability.  The Court has gone on to conclude that because the amended does not satisfy each prong of the *Lebron* test, and therefore, Yale cannot be considered a state actor.

2.     **In Actuality, There Is No Such Hardline Test To Determine The Kind Of Governmental Involvement Necessary To Find That A Non-Governmental Employer Acted Under Color Of Law.**

The Supreme Court has emphasized that the ultimate question in such cases is whether "*the seemingly private behavior may be fairly treated as that of the State itself*". See, Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)).

Therefore, the Supreme Court as well as lower Courts have used "*a variety of approaches to answer this question*". (See, West v. Atkins, 487 U.S. 42 (1988)): whether the defendant was performing a traditionally exclusive public function (See, Jackson v. Metropolitan Edison Co., 419, U.S. 345 (1974). "*We have, of course, found state action present in the exercise by private entity of powers traditionally exclusively reserved to the State.*" 419 U.S. at 352.); whether the defendant received "significant encouragement" from the state or felt the ramifications of the state's exercise of its "coercive power," (See, Blum v. Yaretsky, 457 U.S. 991 (1982); whether the defendant participated in a joint activity with the government (See, Lugar v. Edmonton Oil Co., 457 U.S. 922 (1982). *"[A] private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor….".);* or, whether the defendant had a "symbiotic relationship" with the government. (See, Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961).

Most recently, the Supreme Court found that a defendant was acting under the color of the law when there was "*entwinement*" of the state and the defendant (See, Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001), (*The Court found entwinement*

*between state education officials and the statewide athletic association such that the acts of the association were considered state action.*); also See, Evans v. Newton, 382 U.S. 296 (1966): in this Fourth Amendment equal protection case, the Court noted that "[c]onduct that formally 'private' may become so entwined with  governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." 382 U.S. at 299).

While some courts have characterized these approaches as "tests", <u>The Supreme Court Has Described Them As "Citeria" Or "Facts" To Consider, And Has Emphasized That Merely Because The Defendant's Actions Do Not Qualify Under One Criterion Does NOT Mean That The Action Was Not Taken Under Color Of Law</u> (See, Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001); *([T]he facts justify a conclusion of state action under the criteria of entwinement, a conclusion in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts.")*.

**<u>If one criterion is satisfied, the requirement can be met</u>.**

 Moreover, actually named defendants in this litigation are Yale School of Medicine and Dr. Lifton, and not Yale University *per se*.  Therefore, District Court's assertion in this case (ECF # 78, page 28, para 2) that "*because the amended complaint does not satisfy each prong of the Lebron test, Yale cannot be considered a state actor.*"--<u>Is Erroneous And Unsubstantiated By The U.S. Supreme Court </u> (See*, Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288 (2001).

Next, unlike in the case of Rendell-Baker v. Kohn, 457 U.S. 830 (1982) (*where <u>merely</u> a private school for children with special needs received public tuition funds, and also required to abide by many government regulations; but the Court found that the public funds paid to the*

*private school did not make the personnel decisions of the school ones taken under color of law*),
the sum of federal government grants to YSM during 2014 alone was $507.1 million---or 75.3%
of all YSM/Yale's grant and contract income in 2015, and YSM ranking only sixth among
medical schools receiving federal government funds from National Institutes of Health (See,
*Attachment # 1, herewith: ECF # 68, page 19, para 2, thro' page 34*; also See, *Renewed
Complaint, pages 30 through' 33, items 2.2 through' 2.5*).

It is indeed naïve to argue that the receipt of hundreds of millions of dollars of federal
research grants annually by Yale School of Medicine as a whole, as well as by Dr. Lifton, is akin
to *a private school for children with special needs received public tuition funds with related
government regulations, as in* the case of Rendell-Baker v. Kohn, 457 U.S. 830 (1982).

Notwithstanding the above huge federal government grants, **YSM also receives:**

(1)   Funding for research from the State of Connecticut;
(2)   Huge state government tax-subsidies which are 3-10 times that of the
      so-called  public colleges and Universities receive in the State of
      Connecticut;
(3)   State tax exemptions to a tune of 2.5 billion to YSM and Yale
      University;
(4)   Connecticut State Assembly advances state research priorities in the
      field of stem cell research through Grants-in-Aid public funds
      programs at YSM;
(5)   The stem cell research advisory committee being chaired by
      Connecticut State Public Health Commissioner;
(6)   Connecticut State Government having established YSM *per se* in
      1810, as well as Yale University;
(7)   State's continued *ex-officiis-* governance up to this time;
(8)   Direct long-lasting and on-going State Government's engagement
      and collaboration with Yale University (YU) and its medical school to
      enable state-wide delivery of mental health and addictions services;
(9)   State dictating and/or influencing of YSM's administration and its
      faculty;
(10)  State legislature demanding more from Yale; and

<blockquote>
(11)    State of Connecticut ownership of the annual "Connecticut Open" tennis tournament at the Connecticut Tennis Center at Yale University---
</blockquote>

are altogether indeed more than sufficient enough to transform YSM into a "State Actor" for the purpose of Section 1983 liability, NOT ONLY in accordance with United States Supreme Court decisions in *Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002)*; *Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)*; *and Marsh v. Alabama, 326 U.S. 501 (1946), BUT ALSO IN ACCORDANCE WITH The federal judiciary's nearly unanimous requirement of MORE involvement of State, in addition to (mere) financial assistance to a private university or professional school, to render the actions of the institution state action for purposes of § 1983, as indicated in Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D.Conn.1978).*

(See, *Attachment # 1, herewith: ECF # 68, page 19, para 2, thro' page 34*; also See, *Renewed Complaint, pages 30 through' 33, items 2.2 through' 2.5*).

All of the above evidencing of facts and figures, collectively unassailably affirm that Yale School of Medicine *per se* certainly qualify as a "State Actor"-- for The purpose of Plaintiff's claims under 42 U. S. C. § 1983, and in the same light, the alleged illegal actions of Dr. Richard Lifton *(tenured and endowed Professor and Chairman of the Genetics Department at Yale School of Medicine and Yale University!)* are to be construed as "State Actions"-- for the purpose of Plaintiff's claims under 42 U. S. C. § 1983 (See, Krynicky v. University of Pittsburg, 742 F 2d 94, 35 FEB 1133 (3rd Cir. 1984); also See, Braden v. University of Pittsburg, 552 F.2d 948, 14 FEB 897 (3rd Cir. 1977); also See, Rendell-Baker v. Kohn, 457 U.S. 830 (1982), **given:**

**(1)**    **The State of Connecticut's** "pervasive entwining" with the leadership of the Yale University and with its School of Medicine *per se (See,    Brentwood    Academy    v.*

*Tennessee Secondary School Athletic Association,  535 U.S. 971 (2002))*; (*See, item # I through XIV, above);*

**(2)** The State of Connecticut's long-standing and on-going "**joint enterprise**" and "**symbiotic relationship**" with YSM and its University (*See, Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)*); (*See, item # IX, above; also See Exhibits # 9 & 11,herewith;  also See,  ECF # 64: Exhibits # 4 & 5;   also See,* **http://www.psychiatry.yale.edu); and**

   **(3)** YSM as well as Yale University are in the service of delivering public health education and health care at the state level, **"a vital public function"**, (**See,** *Marsh v. Alabama, 326 U.S. 501 (1946)).*  Providing higher education and promoting public health and related research, **"are in fact vital to the State as a whole, and therefore traditionally performed by States".   Education is primarily a State and local responsibility in the United States.  The structure of education finance in America reflects this predominant State and local role (See,** https://www2.ed.gov/about/overview/fed/role.html).

  The States and their local subdivisions retain the primary responsibility for health under the U.S. Constitution (See, https://www.ncbi.nlm.nih.gov/books/NBK221231/).  Connecticut's official activities to protect and promote the public health of its citizens arguably date to 1878, and the  Connecticut's Department of Public Health (DPH) is charged with protecting the public health (*CGS § 19a1a et seq.*).

(See, https://www.cga.ct.gov/PS98/rpt%5Colr%5Chtm/98-R-1352.htm: *See, Exhibit # 13, ECF # 68-1*).

    It is clear that "[t]he State has so far insinuated itself into a position of interdependence with the [private party] that it must be recognized as a joint participant in the challenged activity", and therefore, under the "entwinement test", the alleged private conduct in this case certainly qualifies as "state action". (Stefanoni, 101, F. Supp. 3d. at 179; quoting Hadges v. Yankers Racing Corp., 918, F. 2d 1079, 1089 (2nd Cir. 1990).

### 3. If Government Requires Or Induces A Private Party To Engage In Law Enforcement, All Relevant Constitutional Restraints Apply.

42 U.S.C.§ 1983: Plausible "State Actor"- Status Claim For The Defendants   Based On The Legal Theory As Has Been Laid Out In The Law Article:  "Privatization,  State  Action, And Title IX: Do Campus Sexual Assault     Hearings Violate Due Process?".

Plaintiff has additionally presented and claimed that the defendants (YSM, Dr. Lifton, and Yale University)- are additionally to be considered as "State Actors" for the purpose of Section 1983 claims given the augmenting  legal theory that has been advanced by none other than Yale Law School Professor, Jed Rubenfeld (*a leading scholar of constitutional law, privacy, the First Amendment, and criminal law*) which has been laid out in his article: *"Privatization, State Action, and Title IX: Do Campus Sexual Assault Hearings Violate Due Process?"* (see, *Exhibit #1, ECF # 76: 14-cv-01582-VAB*).

Under "state action" doctrine properly understood, argues Rubenfeld, **"If government requires or induces a private party to engage in law enforcement, all relevant constitutional restraints apply."** This is exactly what the Obama administration Department of Education did in April 2011 when it instructed universities, on pain of losing federal funding, to investigate, adjudicate, and punish all allegations of sexual assault. That is, although the government also demanded that universities shrink due process protections for the accused, by deputizing them to engage in law enforcement in addressing allegations of sexual misconduct, the administration in effect imposed on them an obligation to comply with constitutional guarantees of due process and equal protection. *(emphasis added)*.

(*Rubenfeld, Jed, Privatization, State Action, and Title IX: Do Campus Sexual Assault Hearings Violate Due Process? (October 21, 2016). Yale Law School, Public Law Research Paper No. 588).*

This crucial claim of imposing an obligation to comply with constitutional guarantees of due process and equal protection, based on government requiring or inducing private Universities (including Yale) to engage in law enforcement, has not been answered by the District Court, and therefore, plaintiff urges this Court to consider this legally sound and extensively researched claim that has been advanced by a leading scholar of constitutional law, privacy, the First Amendment, and criminal law at the Yale University Law School, as it confers "State Actors" status to the defendants along with the University, for the purpose of plaintiff's Section 1983 claims against them, which has been drafted by a leading scholar of constitutional law, privacy, the First Amendment, and criminal law at the Yale University Law School.

The District Court has apparently not passed any judgment concerning this claim of "State Actors"- by plaintiff based on the legal theory of federal government administration in effect having imposed on the defendants, along with the University, an obligation to comply with constitutional guarantees of due process and equal protection, by conferring on them "State Actor" status.

Notwithstanding, the above claim of imposing an obligation to comply with constitutional guarantees of due process and equal protection, based on federal government requiring or inducing the (so-called) private Universities (including Yale) to engage in law enforcement, plaintiff- appellant has extensively exhibited (*see, ECF # 68-1???)* and argued (*see, Attachment herewith: ECF # 68, pages 14-34)* that defendant-appellee, Yale School of Medicine (YSM), with or without Yale University proper, qualifies as a "State Actor", **given:**

I.     Yale was originally chartered by the colonial legislature of Connecticut as the Collegiate School (See, https://www.britannica.com/topic/Yale-University).

II. In 1810 the Connecticut (State) General Assembly established the medical institution of Yale College, giving Yale University and the Connecticut Medical Society shared jurisdiction over the training of physicians.

III. In fact, the Original Yale School of Medicine building was purchased with a grant by the Connecticut State Legislature (See,https://commons.wikimedia.org/wiki/File%3AOriginal_ Yale_School_of_Medicine_building_Grove_Street_New_Haven_ Connecticut.jpg).

IV. During 1833, the State Hospital, precursor to the New Haven Hospital, was established, and during 1884, the hospital's name was changed to New Haven Hospital (*See, Exhibit # 4; ECF # 63*). In fact, the original hospital building was named "State Hospital", and only in 1884, the hospital's name was changed to "New Haven Hospital" to reflect the name that was widely being used by the residents of New Haven (*See, Exhibit # 5; ECF # 63*).

V. The term, "Yale College" was changed to Yale University in 1887, and the name of the medical school automatically changed, too. The current name, Yale School of Medicine was adapted (by the State Legislature) in 1918 (*Exhibit # 4*; *ECF # 63).*

VI. It is important to note that the ties between Yale School of Medicine and the State of Connecticut were never ever severed, and the State remains *"intrinsically involved"* up to this time, and the State is also *"intrinsically involved"* in the overall governance of the University at the highest level up to this time.

VII. Yale University's By-Laws, as approved by the Yale Corporation, dated December 5, 2015, affirms that Yale's Governing Body, known legally as "The President and Fellows of Yale College"—or, more simply, as "The Corporation", "comprises of the Governor of State of Connecticut *(ex-officiis)*, the Lieutenant Governor of the State of Connecticut *(ex-officiis)*, along with the President of Yale University (*see ECF # 64: Exhibit # 5—*

*Annex: https://www.yale.edu/about-yale/president-* *leadership/governance-historic-documents/yale-corporation-laws*).

VIII.  In 1792, <u>by act of the General Assembly of the State of Connecticut,</u> the ten Successor Trustees were joined by eight Trustees *ex-officiis*: <u>the Governor and Lieutenant Governor, and "six senior assistants in the Council of this State." In 1819 the six senior assistants were replaced by the six senior State Senators.</u> The attendance of the Senators at Corporation meetings was, however, perfunctory and unreliable. <u>In 1871, therefore, the State Legislature agreed to divest them of their membership and granted the Yale alumni the right to elect, instead, six of their own member</u>………….. (*see ECF # 64: Exhibit # 5—Annex:* *https://www.yale.edu/about-yale/president-leadership/governance-historic-documents/yale-corporation-laws*). <u>Thus,  Yale School of Medicine and Yale University as a whole are in fact "Co-Sponsored And Co-Governed by the State of Connecticut up to this time".</u>

IX.  <u>In addition to the above *ex-officiis* governance of Yale Corporation by the Governor and the Lieutenant Governor of the State of Connecticut,</u> Plaintiff has evidenced *(See ECF # 62-1: p. 33, and Exhibit # 3)*, that the Connecticut Mental Health Center (CMHC) is in fact a direct State Government's engagement and collaboration with Yale medical school (YSM), <u>to enable state-wide delivery of mental health and addictions services to uninsured and underinsured people, a collaboration in public service.</u>

The Connecticut Mental Health Center celebrated its 50th anniversary in 2016, was founded in 1966, and is one of the oldest community mental health centers in the United States. <u>An enduring direct collaboration between the</u> <u>State of Connecticut Department of Mental Health & Addiction Services and the Yale School of Medicine's Department of Psychiatry,</u> and the Connecticut Mental Health Center provides recovery-oriented mental health services for 5,000 people in the Greater New Haven area each year.

The Connecticut Mental Health Center also serves as a center for scientific advancement in the understanding and treatment of mental health and substance abuse disorders.

 (*See, Exhibit # 9, herewith;* https://medicine.yale.edu/psychiatry/care/cmhc/).

Further, the Connecticut Mental Health Center is one of three major institutions of Yale Medical School's Department of Psychiatry along with the United States Department of Veterans Affairs- Connecticut Healthcare System, and the Yale-New Haven Psychiatric Hospital (*See, Exhibit # 9, herewith;* http://www.psychiatry.yale.edu).

X.    Further, the Connecticut State General Assembly passes legislations dictating or influencing the administration of Yale School of Medicine and its faculty, as well as controlling Yale School of Medicine's services (*Yale medical group*), teaching, conduct of research, and its finances, given Yale University's State tax free status  (See Exhibit # 10, herewith: http://news.yale.edu/2016/03/15/yale-s-taheri-cautions-against-potential-negative-consequences-state-legislative-proposal; also See, http://fortune.com/2016/03/24/yale-endowment-connecticut/).

Additionally, State of Connecticut Senate President recently acted to influence Yale Medicine, which includes more than 1,400 clinical faculty at the Yale School of Medicine, demanding contract agreement with another health care provider (See, http://www.nhregister.com/health/20160929/connecticut-senate-president-pushes-for-anthem-yale-medicine-contract-agreement&template=printart; also See, *See, Exhibit # 10, herewith*).   Further, State lawmakers sought more from Yale: Two Democratic leaders in the General Assembly made a case Tuesday for Yale University to invest part of the annual increase in its endowment in local job growth and educational opportunities or write the state a check for $78 million.  The State law makers pointed out that "not all private universities are in fact private universities," since the tax subsidies  that they receive exceed  anything received  by public colleges and universities, estimating that the per student taxpayer subsidy at Yale to be 3 times that of the University of Connecticut (*See, Exhibit   # 11, herewith*: also see, page 1, paragraphs  7 & 8 at:

*http://www.pressreader.com/usa/new-haven-register-new-haven-ct/20160323/281496455409137* (also See, Exhibits # 10 & 11, herewith).

XI.     The State of Connecticut is so pervasively and integrally intertwined with Yale School of Medicine and  Yale University, even the annual "Connecticut Open" tennis tournament at the Connecticut Tennis Center at Yale in New Haven, CT is owned by the State of Connecticut (See, http://www.ctopen.org/tournamentinformation/)..

        All the above, items, # I through # XI- evidencing affirm that the defendant-appellee in this case, Yale School of Medicine as a "State Actor", in accordance with United States Supreme Court decisions in *Brentwood Academy v. Tennessee Secondary School     Athletic Association, 535 U.S. 971 (2002)*; *Burton v. Wilmington Parking Authority, 365         U.S. 715 (1961)*; *and Marsh v. Alabama, 326 U.S. 501 (1946).*

        Plaintiff has gone further to additively evidence that Yale School of Medicine receives considerably large amounts of financial assistance from the State of Connecticut *per se*, as well as from the Federal Government *(See, Exhibit # 12, herewith;  also See ECF # 62-1, Exhibits 1 to 2)*, as indicated below:

XII.    Yale Medical School (along with the University) was tax exempted by the State of Connecticut to a tune of $2.5 billion according to the 2013 grand list *(See ECF # 62-1, Exhibit # 1)*;

XIII.   The tax subsidies (*tax-free status*) that Yale receives from the State of  Connecticut are far greater (*3-10 times more!*) than the so called public colleges and universities receive in the State of Connecticut, according to *the Nexus Research & Policy Center.*  Under a 182-year-old State Law, academic property of Yale is exempt from State taxes (*See, Exhibit # 11, herewith*: http://nexusresearch.org/wpcontent/    uploads/2015/06/Rich_Schools_Poor_Students.pdf);

XIV.　The Connecticut Stem Cell Research Grants-in-Aid Program to Yale School of Medicine was established by the Connecticut General Assembly in June 2005 when it passed Connecticut General Statutes §19a-32d through §19a-32g. These stem cell research grants are part of the $100 million Stem Cell Research Fund which was created by legislation that signed by the Governor of the State of Connecticut into law in 2005 making Connecticut just the third state in the nation to offer public funding for human stem cell research.  The Connecticut Stem Cell Research Advisory Committee is chaired by Connecticut State's Public Health Commissioner.   For the number of these Connecticut State's stem cell research grants that were awarded to Yale School of Medicine specifically each year, starting from 2006, see *Exhibit # 12*, herewith; also See, ECF # 62-1, Exhibit # 2.

XV.　The sum of federal government grants given to Yale during 2014 alone　was　$507.1 million — or <u>75.3 percent of all Yale's grant and contract</u> <u>income in 2015</u> (See, <u>http://yaledailynews.com/blog/2015/11/03/med-school-income-soars-as-federal-funding-falters/</u>); and thus,

XVI.　Yale School of Medicine ranking sixth among medical schools receiving Federal Government funds from the National Institutes of Health (NIH), and second in NIH dollars per faculty member (<u>http://medicine.yale.edu/facts/</u>).

All of the above items #I through # XVI- evidencing of facts and figures, collectively unassailably affirm that Yale School of Medicine *per se*, with or without the Yale University proper, certainly qualify as a "State Actor"-- for the purpose of Plaintiff's claims under 42 U.S. C. § 1983,  and in the same light, the alleged illegal actions of Dr. Richard Lifton *(tenured and endowed Professor and Chairman of the Genetics Department at Yale School of Medicine and Yale University!)* are to be construed as "State Actions"-- for The purpose of Plaintiff's claims under 42 U.S. C. § 1983,

<u>**INFERENCE:**</u>

**Therefore, District Court's Premature Granting Of Defendants' Motion To Dismiss Under Rule 12(B)(6)- For Failure To State A Claim Is Without Merit, And It Is An Abuse Of Its Discretion.**

---

**II.** <u>**RESPONSE TO SOME OF THE DISTRICT COURT'S ERRONEOUS RULINGS CONCERNING PLAINTIFF'S CLAIMS UNDER TITLE VI.**</u>

Contrary to District Court's assertion in agreement with defendants (*as the Court has unfortunately and unjustifiably opted to design and draft each of its arguments in order to entirely negate and dismiss pro se plaintiff's each and every aspect of the continuing violations claim!)*, **Title VI rules and regulations COVERS THE ENTIRE ENTITY** (*meaning, not just the entity or program that receives the Federal funding within a department, or University, or corporation providing higher education, health care, etc.!*), **and therefore, Title VI covers not only Yale School of Medicine and Dr. Lifton, but also, the entire Yale University, due to the enactment of the Civil Rights Restoration Act, which amended Title VI as well as other federal laws:**

**Under the Civil Rights Act Amendments [42 U.S.C. 2060d-4a], Sec. 6. Title VI of the Civil Rights Act of 1964 is amended by adding at the end the following new section:**

**"<u>Sec. 606</u>. For the purposes of this title, the term '*program and activity*' and the term '*program*' mean all of the operations of:**

**(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government, or**

**(2)(A) <u>a college, university</u>, or other postsecondary institution, or a public system of higher education, or**

**(3)(A) <u>an entire corporation, partnership, or other private organization, or an entire sole proprietorship</u>---**

**(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole, or and recreation; or**

        **(ii) <u>which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation</u>, or**

      **(4) any other entity which is established by two or more of the entities described in paragraphs (1), (2), or (3);**

<u>**any part of which is extended Federal financial assistance**</u>**."**

      Next, in order to negate District Court's further contention that Dr. Lifton cannot be a defendant in a Title VI action, as Title VI only applies to entities that receive Federal financial assistance, quoting cases that are basing their decisions on "Specific Entity"-concept, instead of the "Entire Entity"- concept,--which has been promulgated by the **Civil Rights Act Amendments [42 U.S.C. 2060d-4a], Sec. 6: <u>Sec. 606</u>, which has been replicated above.**

      Along with YSM, Dr. Lifton is certainly responsible for assuring compliance with applicable federal laws and statues pertaining to the utilization of federal government funds that were allocated to him based on his research proposals, as the Principal Investigator as well as senior investigator of multitudes of Federally funded research projects to him as a scientist based at YSM.

      To substantiate the culpability of Dr. Lifton under Title VI, it should be realized that Dr. Lifton is the Principal Investigator (PI) of  multitudes of entirely Federally funded research projects consisting several millions of dollars, that were drafted and justified by him directly to the Federal funding agencies over these years  Therefore, Dr.Lifton also is a defendant along with YSM and Yale University, for the alleged retaliation by him against plaintiff, in violation of Title VI (*along with the other alleged violations in this case*).

In a recent case involving abuse of federal government research grants at the Northwestern University by another similar federal grants recipient (Principal Investigator) scientist, Dr. Bennett (See, *United States, et al., ex rel. Melissa Theis v. Northwestern University, Dr. Charles L. Bennett, et al.,* No. 09 C 1943 (N.D. Ill., 2009)).

In this case, it is alleged that the defendants (*Northwestern University and Dr. Bennett*) submitted false claims to the United States when the Principal Investigator (Dr. Bennett) directed and authorized the spending of grant funds on goods and services that did not meet applicable NIH and government grant guidelines.

`       <u>The allegations were investigated by the U.S. Department of Health and Human Services Office of Inspector General, the Federal Bureau of Investigation, the National Institutes of Health, and the U.S. Attorney's Office.</u> The government contends that it has certain civil claims against Northwestern arising out of Northwestern's improper submission of claims to NIH for grant expenditures for items that were for the personal benefit of the Principal Investigator of the grant money (Dr. Bennett).

Although the University settled the case by paying nearly $ 3 million, the government (US Department of Justice) ALSO pursued the case against the Principal Investigator, Dr. Bennett (*who is also a physician scientist just like Dr. Lifton!*), and reached a settlement agreement, wherein, Dr. Bennett shall pay to the United States $475,000 (Settlement Amount)

(See, Settlement Agreement - Department of Justice, at

http://www.justice.gov/sites/default/files/usao-ndil/legacy/2015/06/11/pr1030_01a_0.pdf;

Former **Northwestern** Physician To Pay The **United States** $475,000 ...

https://www.justice.gov/usao-ndil/pr/former-northwestern-physician-pay-united-states-475000-settle-cancer-research).

This case certainly establishes the fact that Principal Investigators and supervisors of the federal research funds recipients, are ALSO held accountable by the U.S. Department of Health and Human Services Office of Inspector General, the Federal Bureau of Investigation, the National Institutes of Health, and the U.S. Attorney's Office.

Therefore, given that the alleged retaliatory violations by federal government funds recipients (*Yale School  of Medicine as well as Dr. Lifton)*, which are actionable under Title VI, can also be actioned as such under Section 1983 for the recipients' violation of violation of constitutional provisions,

it is indeed naïve to argue that the receipt of hundreds of millions of dollars of federal research grants annually by Yale School of Medicine as a whole, as well as by Dr. Lifton, is akin to *a private school for children with special needs received public tuition funds with related government regulations, as in* the case of Rendell-Baker v. Kohn, 457 U.S. 830 (1982).

Notwithstanding the above huge federal government grants,**YSM also receives:**

(1)     Funding for research from the State of Connecticut;
(2)     Huge state government tax-subsidies which are 3-10 times that of the so-called  public colleges and Universities receive in the State of Connecticut;
(3)     State tax exemptions to a tune of 2.5 billion to YSM and Yale University;
(4)     Connecticut State Assembly advances state research priorities in the field of stem cell research through Grants-in-Aid public funds programs at YSM;
(5)     The stem cell research advisory committee being chaired by Connecticut State Public Health Commissioner;
(6)     Connecticut State Government having established YSM *per se* in 1810, as well as Yale University;
(7)     State's continued *ex-officiis-* governance up to this time;

(8)      Direct long-lasting and on-going State Government's engagement and collaboration with Yale University (YU) and its medical school to enable state-wide delivery of mental health and addictions services;

(9)      State dictating and/or influencing of YSM's administration and its faculty;

(10)    State legislature demanding more from Yale; and

(11)    State of Connecticut ownership of the annual "Connecticut Open" tennis tournament at the Connecticut Tennis Center at Yale University---

----are altogether indeed more than sufficient enough to transform YSM into a "State Actor" for the purpose of Section 1983 liability, NOT ONLY in accordance with United States Supreme Court decisions in *Brentwood Academy v. Tennessee Secondary School Athletic Association, 535 U.S. 971 (2002)*; *Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)*; and *Marsh v. Alabama, 326 U.S. 501 (1946), BUT ALSO IN ACCORDANCE WITH The federal judiciary's nearly unanimous requirement of MORE involvement of State, in addition to (mere) financial assistance to a private university or professional school, to render the actions of the institution state action for purposes of § 1983, as indicated in Huff v. Notre Dame High School, 456 F.Sup. 1145, 1148 (D.Conn.1978).*

(See, *Attachment # 1, herewith: ECF # 68, page 19, para 2, thro' page 34*; also See, *Renewed Complaint, pages 30 through' 33, items 2.2 through' 2.5*).

### INFERENCE:

It **Is Erroneous As Well As Biased For The Court To Agree With Defendants' Argument That Title VI Claims Cannot He Asserted Against Dr. Lifton, "As Title VI Is Only Applicable To Programs Receiving Federal Assistance" (ECF # 78, page 7, para 3).**

**Therefore, District Court's Premature Granting Of Defendants' Motion To Dismiss Under Rule 12(B)(6)- For Failure To State A Claim Is Without Merit, And    It Is An Abuse Of Its Discretion.**

———————————————————

**III.     WHEN AN EMPLOYEE'S PARTICIPATION IN STATUTORILY PROTECTED ACTIVITY IS THE DETERMINING FACTOR IN AN EMPLOYER'S DECISION TO TAKE [SIC] ADVERSE EMPLOYMENT ACTION, THAT ACTION IS INVALID. REGARDLESS OF THE EMPLOYER'S     INTENT." *EEOC V. BD. OF GOVERNORS OF STATE COLLEGES AND UNIVERSITIES,* 957 F.2D  424, 428 (7TH CIR.,1992.**

*"The goal of anti-retaliation provisions is to "maintain unfettered access to statutory remedial mechanisms." Robinson  v. Shell Oil Company,* 519 U.S. 337 (1997).   Plaintiff has asserting his claims of continuing retaliatory violations under the "Continuing Violations Doctrine" *which Extends The Statute Of Limitations In Employment Cases (S*ee, Kyle Graham*, and The Continuing Violations Doctrine. 43 Gonz. L.Rev. 271, (2008), at* https://www.law.gonzaga.edu/law-review/2008/03/10/  the-continuing-violations-doctrine/; and Kring & Chung, LLP, *,  at*  http://www.kringandchung.com/blog/2016/05/the-continuing-violation-doctrine-extends-the-statute-of-limitations-in-employment-cases.shtml),

The Continuing Violations Doctrine tolls the statute of limitations for the Title VII and 42 U.S.C. § 1981  claims, if one can show a series of related acts, one or more of which falls within the limitations period, as defined by the U.S. Supreme Court in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), which has subsequently been affirmed by the Circuit Courts as well in *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 279 (5th Cir. 2004)*, and  in Mandel v. M & Q Packaging Corp.,* No. 11-3913, 2013 WL 141890 (3d Cir. Jan. 14, 2013).

**1.     The Vast Majority Of Employment Law Statutes Explicitly Prohibit Retaliation *In Any Form*. *Even Where There Is No Explicit Ban, Courts Are Likely To Find   That One Is Implied*, As The Supreme Court Did In The Context Of  Title *Ix.   Jackson V. Birmingham Bd.Of Ed.* 125 S. Ct. 1497 (2005).**

The Federal civil rights laws prohibit discrimination based on race, color, national origin, sex, disability and age in programs or activities receiving Federal financial assistance.  In

additional to prohibiting discrimination, <u>each of these civil rights laws also prohibits retaliation against individuals who assert their civil rights *in any form*</u>, since the ability of individuals to oppose discriminatory practices and to participate in investigations and other proceedings is critical to ensuring equal educational opportunity in accordance with Federal civil rights laws.

2. **Recipients Of Federal Funds Are Prohibited From Intimidating, Threatening, Coercing, Or Discriminating Against Any Individual For The Purpose Of Interfering With Any Right Or Privilege Secured By Federal Civil Rights Laws.**

For the above reason, **recipients of Federal funds** (*both Defendants in this case!*) are prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by Federal civil rights laws. ….., **the recipient institution** (*Yale University)* is prohibited from retaliating, including intimidating, threatening, coercing, or in any way discriminating against the individual, *because of the individual's complaint or participation.*

Title VI (and IX) implicitly allow plaintiffs to bring retaliation claims <u>if their employer or school retaliates against them for complaining about intentional racial or gender discrimination because such suits are strongly consistent with the statutes' primary purpose of prohibiting federal funds recipients from engaging in intentional discrimination.</u>

IV. <u>**RESPONSE TO COURT'S ASSERTION (*ECF # 78, PAGE 19, PARA 1*) THAT EVEN IF THE CONTINUING VIOLATION DOCTRINE DID APPLY, ALL ASPECTS OF TITLE VI CLAIMS ARE PROPERLY DISMISSED FOR FAILURE TO ALLEGE PARTICIPATION IN PROTECTED ACTIVITY THAT IS RECOGNIZED BY TITLE VI.**</u>

Title VI Manual of the US Department of Justice has not negated the applicability of continuing violations claim under Title VI, and it refers to continuing violation as that which is occasioned by continual unlawful acts, not continual ill effects from an original violation. Although the development of the law as to what constitutes a continuing violation has occurred largely under Title VII with several seminal Supreme Court decisions, there is every reason to believe that it is fully applicable not only to ADEA cases, but also to Title VI. Even in cases where continuing violation cannot be shown, courts have held that evidence of those claims may be relevant to later discrimination for which timely charges were filed (See, *Caldwell v. National Ass'n of Home Builders*, 771 F 2d 1051, 38 FEB 1398 (7th Cir. 1985).

As in the case of *McDonnell Douglas Corp., v. Green,* 411 U.S.792 (1973), retaliation claims are analyzed using the traditional burden-shifting frame work. To prevail, a plaintiff must show:

(1) That he/she engaged in a statutorily protected activity;

(2) That he/she suffered an adverse employment action; and

(3) That retaliation was a motivating factor in the employer's decision.
   *Treglia v. Manlius,* 313F.3d 713, 719 (**2nd Cir.** 2001).

### 1.     PROOF OF PLAINTIFF'S ENGAGEMENTS IN STATUTORILY PROTECTED ACTIVITIES.

**A.     Repercussions Of Appellant's Racial, Gender- Based Discrimination   And Illegal Political Activism And Related Discrimination Complaint To Yale University School Of Medicine- Genetic Department Chairman, Dr. Richard Lifton.**

<u>First,</u> Plaintiff had alleged in his written complaint to Dr. Lifton, YSM- Genetics Department Chairman (Defendant) about intentional racial or gender discrimination at the

Genetics Department (YSM) in the awarding of Federally funded ABMG- clinical cytogenetics training, as well as subsequent retaliation by Dr. Qumsiyeh (an associate professor working under the supervision of Dr. Lifton).   Plaintiff has also alleged in that complaint about the unethical political activism by Dr. Qumsiyeh, and plaintiff additionally having been retaliated against by Dr. Qumsiyeh due plaintiff's refusal to participate in the unethical political activism. In the complaint has also refused to serve as a witness against Dr. Qumsiyeh, as Dr. Lifton desired.   Consequently, since Dr. Lifton coercively retaliated against plaintiff by not issuing proper job recommendations for  plaintiff's job opportunities at Harvard Medical School and elsewhere, although plaintiff had successfully completed his professional clinical cytogenetics training at Dr. Lifton's Genetics Department.  Plaintiff has evidenced dozens of emails and other evidentiary documents, indicating Dr. Lifton's continued retaliation against plaintiff's dozens of professional job opportunities at Harvard Medical School and around the nation, since any prospective employer in plaintiff's professional filed is obligated to call Dr. Lifton and/or Dr. Bale (who directs the medical genetics professional training program under Dr. Lifton).   (See, Attachment # 4: Renewed Complaint).

Title VI regulations provide that *"[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or <u>because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart.</u>"* 28 C.F.R. § 42.108(e) (Department of Justice Regulation).  Plaintiff has demonstrated <u>a causal connection due to his written complaint to Dr. Lifton, and continuing adverse actions against him</u> (*See Davis v. Halpern, 768 F.Supp. 968, 985 (E.D.N.Y. 1991).*

**B.** **Repercussions Of Appellant's Readily Available Internet Record Of   Prior EEO   And Civil Suit Against The National Institutes Of Health (*U.S.Department Of  Health And Human Services*).**

Secondly, EEOC investigative documents did reveal that appellant's prior (*openly accessible on the internet*) record of EEO- civil suit history as a definite factor for the alleged continuing retaliatory discrimination by the appellees individually and collectively.  It should be noted that it was the EEOC- investigative documents that were officially made available to plaintiff, along with the EEOC- "notice of right to sue"_which actually revealed the court transcripts (*Exhibit # 2, herewith)* of plaintiff's prior record of having filed an EEO complaint and civil suit against the National Institutes of Health, that currently constitutes plaintiff's additional for continuing retaliatory and discriminatory violations- factor,  as has been presented in detail in plaintiff's consolidated complaint (see, *ECF # 54, Factor and Allegation- V: pages 22-24).*

Plaintiff undoubtedly believes that these two protected conducts cumulatively caused the ceaseless and reckless retaliations and discrimination by the defendants as a whole that has caused permanent loss of plaintiff's high-paying and in-demand clinical cytogenetics profession to this day, and losses to his scientific research career as well.

Thus, the above two protected acts of plaintiff satisfy the requirement of plaintiff having engaged in a statutorily protected activity, as per the requirement for retaliation claims,  as in the case of *McDonnell Douglas Corp., v. Green,* 411 U.S.792 (1973).

Plaintiff believes that the above two protected activities, collectively, form the basis for his retaliation claims under Title VI as well as under Title VII, in this suit, and there is a causal connection between these two protected activities and Dr. Lifton's continuing adverse retaliatory

<u>actions</u> : *See Davis v. Halpern, 768 F.Supp. 968, 985 (E.D.N.Y. 1991). (Defendants' summary judgment motion to dismiss Title VI retaliation claim was denied because he established evidence of prima facie case!).*

Plaintiff in his renewed complaint has also amply shown that he has been subjected to continuing acts of retaliatory discrimination ever since.    As evidenced and presented in the renewed complaint, retaliation was the motivating factor (See, *Treglia v. Manlius,* 313F.3d 713, 719 (2nd Cir. 2001; also see, *McKie v. New York University*, 2000 WL 1521200, at *4 (S.D.N.Y. October 13, 2000)).

 "As in other civil rights contexts, to show 'protected activity,' the plaintiff in a Title VI retaliation case need 'only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring.'" Id. at 320 (citing *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1503 (11 Cir. 1990)); see also *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 355 n.1 (4 Cir. 1985) (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of discrimination was in fact meritorious).

## INFERENCE:

Therefore, District Court's  Assertion (ECF # 78, Page 19, Para 1) *That Even If The Continuing Violation Doctrine Did Apply, All Aspects Of Title VI Claims Are    Properly Dismissed For Failure To Allege Participation In Protected Activity That Is Recognized By Title VI—***Is Unfounded And Abuse Of Its Discretion***.

—————————————————

## V.    42 U.S.C.§ 1983 TO ENFORCE TITLE VI'S SECTION 602 REGULATIONS.

In *Powell v. Ridge (*189 F.3d 403 (3d Cir. 1999) the third Circuit concluded that the plaintiffs could sue under § 1983 to enforce the same Title VI regulations.  Section 1983 is a

powerful tool for vindicating both constitutional and federal statutory rights, including regulations such as those issued pursuant to section 602 that "flesh out" existing statutory rights. In light of Title VI's limited explicit remedies, there is no basis to find that the statute precludes § 1983 claims. Title VI plaintiffs should be able to use § 1983 suits to raise constitutional claims and sue officials in their individual capacities because Title VI itself does not provide such remedies.

(See, "**Using § 1983 to Enforce Title VI's Section 602 Regulations**",
Bradford C. Mank. *Kansas Law Review, Vol. 49, p. 321, 2001; U of Cincinnati Public Law Research Paper No. 10-21,* Last revised: 27 Apr 2010; https://papers.ssrn.com/sol3/papers.cfm?abstract_id=261716).

### 1.      Spending Clause 1 (Article I, Section 8), of the U.S. Constitution

Spending Clause 1 (Article I, Section 8), of the U.S. Constitution has been widely recognized as providing the federal government with the legal authority to offer federal grant funds to states and localities that are contingent on the recipients engaging in, or refraining from, certain activities.

However, the Supreme Court has articulated certain limitations on the exercise of this power. In its 1987 decision in *South Dakota v. Dole*  483 U.S. 203, 205-08 (1987) (quoting *Pennhurst State Sch. & Hosp.,* 451 U.S. at 17), the Court held that legislation enacted pursuant to the Spending Clause must be in pursuit of the "general welfare." In addition, the *Dole* Court held that any conditions attached to the receipt of federal funds must **NOT, (among other things) violate other provisions of the Constitution, such as the** <u>**First Amendment**</u> **OR** <u>**the Due Process**</u> **OR** <u>**Takings Clauses of the Fifth Amendment.**</u>

2. **Title VI Violations Can Also Be Actioned As Such Under Section 1983 For "Non State Actors".**

Therefore, the alleged retaliatory violations by federal government funds recipients (*Yale School of Medicine as well as Dr. Lifton)*, which are actionable under Title VI, can also be actioned as such under Section 1983 for the recipients' violation of violation of plaintiff's constitutional provisions, such as the First Amendment OR the Due Process OR Takings Clauses of the Fifth Amendment, Without The Recipients Being "State Actors".

**Consequently, District Court's assertion that plaintiff must show that defendants acted under the color of the law to stake a claim under Section 1983 is** <u>**invalid,**</u> given the Supreme Court's decision in *South Dakota v. Dole* 483 U.S. 203, 205-08 (1987) (quoting *Pennhurst State Sch. & Hosp.,* 451 U.S. at 17), regarding the use of the federal government's conditional spending power.

<u>**INFERENCE:**</u>

**Therefore, District Court's granting of defendants' motion under 12(b)(6) for the alleged failure to state a claim is an abuse of discretion, and should be vacated and remanded.**

---

VI. <u>**HE CORE ANTIDISCRIMINATION PRINCIPLES IN BOTH TITLE VI (AND TITLE IX) SUPPORT A PRIVATE RIGHT OF ACTION AGAINST RETALIATION BASED ON ALLEGATIONS OF INTENTIONAL DISCRIMINATION.**</u>

Rrecipients of federal aid have voluntarily accepted financial assistance exchange for accepting the conditions of Title VI or Title IX's regulations, <u>including regulations prohibiting</u>

retaliation.  Even to the extent that courts should construe **Title VI** or Title IX **in light of Title VII**, there is a strong argument in favor of implied rights of action against retaliation."

### 1.   *Sullivan and Its Progeny* **Imply a Private Right of Action Against Retaliation.**

"In 1969, the Supreme Court in *Sullivan v. Little Hunting Park*, 396 U.S. 229 (1969) held that **§ 1982** implicitly prohibits retaliation. The Supreme Court has consistently treated retaliation against civil rights complainants as a form of intentional discrimination. The Court has held that "retaliation offends the Constitution [because] it threatens to inhibit exercise of the protected right" and "is thus akin to an unconstitutional condition demanded for the receipt of a government-provided benefit."  (emphasis added).

### 2.   **Title VI Reaches Private Actors Who Are Recipients Of Federal Funds.**

"A complainant may bring a retaliation claim under Title VI or under a Title VI regulation that prohibits retaliation. Title VI regulations provide that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart." 28 C.F.R. § 42.108(e) (*Department of Justice Regulation*)."

Further, given the Supreme Court's decision in *South Dakota v. Dole*  483 U.S. 203, 205-08 (1987) (quoting *Pennhurst State Sch. & Hosp.,* 451 U.S. at 17), regarding the use of the federal government's conditional spending power, Yale School of Medicine as well as Dr. Lifton, for the alleged continuing retaliatory violations can be held accountable as such under Section 1983 even without being "state actors".

**INFERENCE:**

Therefore, District Court's contention that Dr. Rafi must show that defendants acted under thecolor of the law, as "state actors", to stake a claim under Section 1983 is rendered invalid.

Consequently, District Court's granting of defendants' motion under 12(b)(6) for the alleged failure to state a claim is an abuse of discretion, and should be vacated and remanded.

-----

## VII.    RETALIATION FOR THE EXERCISE OF FIRST AMENDMENT RIGHTS IS A BLACK-LETTER CONSTITUTIONAL VIOLATION.

In fact, an act taken in retaliation for the exercise of a constitutionally protected rights is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.

To succeed on a First Amendment retaliation claim, a civil-rights plaintiff must demonstrate three things. First, the plaintiff engaged in protected conduct. This means that the plaintiff's speech or expression was the type traditionally covered under the First Amendment. Second, an adverse action was taken against the plaintiff that would deter "a person of ordinary firmness" from continuing to engage in that speech or conduct. Third, there is a cause-and-effect relationship between these two elements, i.e., the adverse action was motivated at least in part by the plaintiff's protected conduct.

U.S. Supreme Court has recently held that a public employee can assert First Amendment retaliation claim based on even mere employer perception.    On April 26, 2016, the U.S. Supreme Court decided that a public agency can incur liability for a First Amendment violation if it demotes or disciplines one of its employee based on the agency's mistaken belief that the employee has exercised a right of free expression.  The Court's decision in *Heffernan v. City of*

*Paterson,* 136 S. Ct. 1412 (2016) rejects theories advanced by the City in that case that the dimensions of constitutional free speech law should let ill-meaning public employers "off the hook" in mistaken perception cases, <u>when an employee never technically exercised any right to speak</u> – but the employer thought he or she had done so.  In rejecting this narrow approach, the Supreme Court has signaled that it will take a practical rather than technical view of the First Amendment in the public employment context in order to protect free speech rights for public employees.

When ruling on a motion to dismiss, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Burns v. Trombly*, 624 F. Supp.2d 185, 196 (N.D.N.Y. 2008) (citing *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)).

Appellant in his Consolidated Complaint along with numerous attachments as exhibits therein, has indeed provided multiple grounds upon which his claims rest through factual allegations sufficient to raise a right to relief above the speculative level." *Camarillo v. Carrols Corp.,* 518 F.3d 153,156 (2d Cir. 2008) (internal quotation omitted), and his factual allegations more than sufficiently gives the defendants "fair notice of what the claim is and the grounds upon which it rests." *Camarillo,* 518 F.3d at 156 (citing *Port Dock & Stone Corp. v. Oldcastle Ne.,* Inc., 507 F.3d 117, 121 (2d Cir. 2007)).

The District Court also failed to review hundreds of documentations (*emails and other evidentiary exhibits*), that are integral to the Consolidated Complaint upon which the plaintiff relied in drafting his pleadings (see, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

Furthermore, when Congress amended Title VII in 1972, according to the Senate Committee Report, the "*primary concern should be to protect the aggrieved person's option to seek a prompt judicial] remedy*" and "*the individual shall have an opportunity to seek his own [judicial] remedy, even though he may have originally submitted his charge to the Commission.*" (S. REP. NO. 92-415, 92d Cong., 1st Sess., at, 23-24 (1971).

The section-by-section analysis of the final version of the 1972 Amendments, stated: "*as the individual's rights to redress are paramount under the provisions of Title VII, it is necessary that all avenues be left open for quick and effective relief.*" (118 CONG. REC. 7168 (1972)). This language is broad and permissive as to aggrieved individuals' right to seek judicial recourse (Swanson, E, A., 32 Hofstra Lab. & Emp. L. J. 345 2014-2015).

Collectively, this legislative history supports the conclusion that Title VII's enforcement provisions permit aggrieved individuals to either seek EEOC assistance by filing an EEOC charge, or to directly seek judicial recourse by filing a judicial complaint (Swanson, E,A., 32 Hofstra Lab. & Emp. L. J. 345 2014-2015).

In the Eleventh Circuit, an employee may bring civil suit prior to filing an EEOC charge so long as the employee subsequently files an EEOC charge and amends the complaint within ninety days of receiving notice from the EEOC of failure to conciliate. (See *Cross v. Ala., State Dep't of Mental Health & Mental Retardation,* 49 F.3d 1490, 1504 (11th Cir. 1995).

Finally, the EEOC does not have superior fact-finding abilities to courts, nor is judicial discovery limited by the EEOC's investigations. ("[E]xhaustion rules are often applied in deference to the superior fact-finding ability of the relevant administrative agency." *Patsy v. Bd. of Regents of the State of Fla.,* 457 U.S. 496, 506-07 (1982) (citing *CON. GLOBE, 42d Cong.,*

*1st Sess.,* 216, 322, 476, 692 (1871)) (*examining the legislative history of the Civil Rights Act of 1871, 17 Stat. 13, the precursor to Section 1983, the court concluded that the bill enabled plaintiffs to choose from dual or concurrent forums, and that exhaustion of administrative remedies should not be judicially imposed*).

## INFERENCE:

**Given the foregoing citation of relevant laws and the augmenting arguments, appellees' each and every one of the motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6) - alleging that appellant fails to state a claim is rendered *null and void*.**

_____

## VIII.  APPELLANT HAS ALSO STATED A CAUSE OF ACTION UNDER 42 U.S.C. § 1981.

In *Cannon v. University of Chicago*, 441 U.S. 677 (1979), by analogy, the Court holds that Title VI provides a cause of action for retaliation and that Plaintiff can bring this cause of action even though he was not the subject of the discrimination complaint.  This interpretation is supported by the Fourth Circuit Court of Appeals' decision in *Peters v. Jenney*, 327 F.3d 307, 318 (4 Cir. 2003), which held that Title VI contains an "implicit prohibition on retaliation" for "opposing practices that one reasonably believes are made unlawful by § 601 [Title VI]."  The Fourth Circuit held that this private right of action was available to the plaintiff regardless of whether the plaintiff was a member of the protected class.  *Id.*

Furthermore, appellant does not have to prove that the conditions against which he protested actually amounted to a violation of **§ 1981**.  See *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful, so long as he can establish that he possessed some good faith, reasonable belief that the underlying challenged actions of the

employer violated the law) (internal citations omitted)); *Turner*, 181 F. Supp.2d at 134; *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

Section 1981, in pertinent part, states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." In *CBOCS West Inc. v. Humphries*, 128 S. Ct. 1951 (2008), the Supreme Court concluded that this provision "encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract related right."

## INFERENCE:

**Accordingly, plaintiff's allegations in his renewed complaint sufficiently plead a claim for retaliation under § 1981 as well.**

_____

## IX.  EEOC DID NOT CERTIFY THAT RESPONDENT (DEFENDANT) IS IN COMPLIANCE WITH THE STATUTES.

Furthermore, contrary Defendants' assertion (*ECF # 74, Page 2, para 2, lines 1-3*), *"that the plaintiff filed a charge of Discrimination with the Massachusetts Commission Against Discrimination",* the charge was indeed filed exclusively with EEOC, and the EEOC simply uses the Commission's electronic complaint filing form.

More importantly, EEOC, indicating the intricacy of the charge and also indicating it's lack of resources to fully investigate the charge, **decided to issue the "notice of right to sue" instead, indicating :**

*"The EEOC issues the following determination.  Based upon the investigation, the    EEOC is unable to conclude that the information obtained  establishes    violations    of    the statutes.*

*This does not certify that the respondent is in compliance with the statutes.*

*No finding is made as to any other issues that might be construed as having been  raised by this charge."*

Plaintiff responds to this Court's statement during the latest hearing referring to Dr. Morton's "initial refusal" to consider plaintiff's candidacy, wherein, Dr. Morton is subtly alluding to Yale's refusal to release plaintiff for the trainee position with Dr. Morton.

<u>Dr. Morton was NOT allowed by Yale (*Dr. Lifton*) ever since to consider any of plaintiff's more than 3 dozen professional clinical cytogenetics job applications over the years, along with several other medical genetics research positions as well, as has been extensively evidenced in the 300 plus exhibits- pages of documentations and emails, corroborating plaintiff's allegations of defendants' continuing retaliatory and coercive violations over these years.</u>

This allegation of Yale's ceaseless and reckless retaliatory and coercive violations against plaintiff has also been verified to be true through Dr. Kucherlapatti, who was the scientific director under whom Dr. Morton was functioning at the time (*plaintiff's meeting appointments with Dr. Kucherlapatti and the notes of the meetings are part of this complaint's exhibits*).  As a part of the trial process, Dr. Morton, Dr. Kucherlapatti, and others will be called to testify under oath.

A serial presentation of all the exhibits in this case to the Jury is most certainly to convince them of these egregious and ceaseless retaliatory and coercive violations by defendants- that has crippled permanently plaintiff's ability to seek a position in his professional field of clinical cytogenetics and medical genetics anywhere in the nation, due to the requirement

of referencing plaintiff's professional clinical training at Yale School of Medicine, which has been pointed out to Dr. Lifton (defendant) by plaintiff in several of his emails, <u>which are exhibited in the renewed complaint.</u>

The alleged illegal and reckless continuing retaliation by the defendants and <u>"its lasting negative ripple effect</u> *within the closely integrated plaintiff's specialty field of professional clinical cytogenetics and medical genetics <u>to this day</u>"*, has not only caused lasting cessation of plaintiff's high-paying and in-demand diagnostic clinical cytogenetics professional career, but has also caused the non-consideration of his non-professional scientific job applications around the nation to this day, and thus rendering him *professionally alienated and depressed pauper today*.

## X.   EQUAL RIGHTS GUARANTEED BY THE CONSTITUTION BECOMES  JUST EMPTY WORDS IF COURTS OPT TO DISMISS *PRO SE* COMPLAINTS.

Although our constitution certainly does not provide for first and second class citizen status based on one's ability to bring on board an attorney to effectively represent him/her in the Court of Law, if Courts opt to dismiss *pro se* complaints citing any imperfection therein negates our constitution's stated goal of "*equal justice under law*", a societal ideal of the American legal system.

Courts should be genuinely dedicated to resolving disputes and to render justice to all citizens impartially, without discrimination on account of race or color or lacking legal representation by an attorney.

Befittingly, Chief Justice of the New Mexico Supreme Court, Charles W. Daniels recently wrote that,  ….."* Without courts that are open to resolve disputes and apply the law, we are left to the lawlessness of the streets and the brute force of the jungle.  A government that*

*cannot enforce its own laws and protect the rights of its citizens simply cannot survive. And we must recognize that we cannot have a functioning justice system without adequate funding. All the laws on the books and all the rights guaranteed by the constitution are just empty words on paper if our courts do not have the basic resources necessary to enforce them."* (http://www.alamogordonews.com/story/opinion/2017/03/21/inadequately-funded-judiciary-denial-justice/99470516/).

## XI. *PRO SE* COMPLAINTS ARE TO BE HELD TO LESS STRINGENT STANDARDS.

Pro se complaints are to be held *"to less stringent standards than formal pleadings and procedure drafted by lawyers." Haines v. Kerner,* 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972); *Matzker v. Herr,* 748 F.2d 1142, 1146 (7th Cir.1984) ("*federal district courts must ensure that pro se litigants are given "fair and meaningful consideration"*"); *Warren v. Correctional Physicians Service,* No. 94-6562, 1995 WL 134808, at * 2 (E.D. Pa. Mar. 29, 1995), citing Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-521 (1972).*

*Pro Se* plaintiff's renewed complaint presents a detailed recitation of the assertions that more than satisfies the basic pleading requirements. A review of the entire complaint demonstrates that the complaint in no way relies upon mere legal conclusions, but contains a detailed factual account of defendants' illegal practices which establish their liability individually and collectively, as alleged.

The renewed complaint identifies with sufficient particularity the who, the what and the how, the when, and the where of defendants' violative conducts. The "who" is specified as the

complaint identifies each defendant and explains his/her respective roles in the alleged conduct at the outset.

Additionally, U.S. Code: Title 28 also requires that all pleadings shall be construed as to do substantial justice. *Burt V. City Of New York,* 2d Cir. (1946) 156 F.2d 791.

A complaint may not be dismissed on motion if it states some sort of claim, baseless though it may eventually prove to be, and inartistically as the complaint may be drawn. Even if the complaint is hard to understand but this, with nothing more, should not bring about a dismissal of the complaint, particularly is this true where a Defendant is not represented by counsel, in view of Rule 8. Under Sub Division (f) of Rule 8 the pleadings shall be construed to do substantial justice: **"***Court will not strike a portion of pleading for want of conciseness when to do so would violate requirement of subdivision (f) of this rule that all pleadings be so construed as to do substantial justice". Sundholm v. Inland Steel Container Co.,* D.C.N.J.1946, 5 F.R.D. 507, 71 U.S.P.Q. 159.

*"The fact that a complaint is hard to understand, with nothing more, should not bring about its dismissal in view of subdivision (f) of this rule requiring that all pleadings shall be so construed as to do substantial justice". Brooks v. Pennsylvania R. Co.,* S.D.N.Y.1950, 91 F.Supp. 101.

*"Plaintiffs' complaint was required to be given the benefit of this rule that pleadings shall be construed so as to do substantial justice". Gribble v. Ditto,* C.C.A.2 (N.Y.) 1941, 119 F.2d 278.

## XII.   <u>THE RENEWED COMPLAINT SHOULD NOT BE DISMISSED.</u>

The general rule in appraising the sufficiency of a complaint for failure to state a claim is that a complaint should not be dismissed …..*"<u>unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.</u>" Conley V. Gibson* (1957), 355 U.S. 41, 45, 46, 78 S.Ct. 99, 102, 2led 2d 80; *Seymour V. Union News Company,* 7 Cir. 1954, 217 F.2d 168.

*"A complaint will not be dismissed for failure to state a claim, even though inartistically drawn and lacking in allegations of essential facts, it cannot be said that under no circumstances will the party be able to recover." John Edward Crockard v. Publishers, Saturday Evening Post Magazine Of Philadelphia, PA* (1956) Fr Serv 29, 19 F.R.D. 511, DCED Pa 19 (1958).

*"In action for damages allegedly due to wrongful and malicious conduct of defendants as officers of town in condemning plaintiff's building, <u>although plaintiff's pleadings were lengthy, repetitive and prolix, where plaintiff was a layman not represented by counsel, requirements of rules of pleading were</u>*

<u>*Waived"*</u>.  *Baker v. Mueller, E.D.Wis.*1954, 127 F.Supp. 722 affirmed 222 F.2d 180.

Plaintiff has presented more than sufficient facts, with hundreds of documentations and emails corroborating his claim, which could be taken as true to indicate that the allegation of continuing coercive retaliatory and discriminatory violation(s) has occurred.

When <u>"entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record,"</u> drawing inferences in favor of the non-movant.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 250 (2000), and <u>when reviewing dismissals for failure to state a claim, courts will accept "all allegations in the complaint as true and constru[e]</u>

facts in the light most favorable to the plaintiff." *Harry v. Marchant*, 291 F.3d 769 (2002).

"But moving to dismiss on the basis of an affirmative defense is generally improper". *Brownmark Films LLC v. Comedy Partners,* 682 F.3d 687, 690 (7th Cir. 2012). "[A]n affirmative defense is external to the complaint and the mere presence of a potential affirmative defense does not render the claim for relief invalid." *(Id.).* Noting the general rule that a plaintiff need not plead around affirmative defenses. *Richards v. Mitcheff,* 696 F.3d 635, 637–38 (7th Cir. 2012).

"A motion to dismiss based on an affirmative defense is apt to be stricken or denied without prejudice (or even with prejudice)". see *Fed. Deposit Ins. Corp. v. Saphir,* No. 10 C 7009, 2011 WL 3876918, at *5 & n. 1 (N.D. Ill. Sept. 1, 2011. "Even if the court adjudicates the motion on the merits, the deviation from the rules may nonetheless send the litigation 'into a procedural sidetrack that may require appellate review to correct". *Bausch v. Stryker Corp.,* 630 F.3d 546, 561–62 (7th Cir. 2010).

## XIII. *PRO SE* PLAINTIFF'S RENEWED COMPLAINT SATISFIED *SWIERKIEWICZ.*

*Pro Se* plaintiff renewed complaint indeed satisfied Federal Pleading Standards because the Supreme Court's precedent in **Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002),** which continues to control in the context of **"private–employer discrimination"**.

In *Swierkiewicz*, Supreme Court held that an employment discrimination plaintiff need not plead a *prima facie* case to satisfy the federal rules and withstand a motion to dismiss. Rather, Supreme Court unanimously adopted a liberal pleading standard for these cases, and none of Supreme Court's subsequent precedent has upset this standard.

## XIV. *1SWIERKIEWICZ* PROVIDES THE PROPER STANDARD FOR    ASSESSING THE SUFFICIENCY OF PLAINTIFF'S RENEWED COMPLAINT, SINCE IT ESTABLISHED THE RULE FOR REVIEWING "A PRIVATE EMPLOYER DISCRIMINATION COMPLAINT".

*Swierkiewicz* is binding precedent on federal courts deciding the sufficiency of complaints alleging employment discrimination because it directly applies to those cases. Applying the *Swierkiewicz* standard to employment discrimination claims protects plaintiffs with meritorious claims from dismissal based on technicalities without jeopardizing protection to defendants.

"Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

In most cases a plaintiff need not plead detailed factual allegations, as Rule 8(a) (2) simply "'contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented . . . .'" *Twombly*, 550 U.S. at 555 n. 3 (2007) (quoting *Wright & Miller, Federal Practice and Procedure § 1202, at 94, 95 (3d ed.) 2004)).*    Furthermore, a claim may be sufficiently plausible even if it appears to the reviewing court "*that recovery is very remote and unlikely.*"  *Twombly,* 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  Thus, plausibility is context-specific, and that in the ordinary, relatively straightforward employment discrimination context, courts should construe a plaintiff's complaint liberally when assessing plausibility.

Under the unanimous *Swierkiewicz* decision, employment discrimination suits are not subject to a heightened pleading standard and must only satisfy the liberal "notice pleading" standard.  *Swierkiewicz,* 534 U.S. at 512.  This standard provides that a complaint satisfies Rule

8(a) (2) if it "'give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id. at 512* (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). (See, *Charles A. Sullivan, Plausibly Pleading Employment Discrimination, 52 William & Mary L. Rev. 1613, 1619-21 (2011).*

Moreover, *Swierkiewicz* dealt directly with an employment discrimination claim, and is particularly applicable to claims against private employers under Title VII, such as plaintiff's claims of employment discrimination, retaliation and coercion- a continuing violations claim under the *Continuing Violations Doctrine.*

Employment discrimination cases are similar to the categories of cases that already receive a liberal pleading standard. Like *pro se* suits and cases where the defendant possesses and controls the information pertinent to the plaintiff's allegations, informational asymmetry between the parties at the pleading stage inherently accompanies employment discrimination suits. See, e.g., *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 782 (7th Cir. 2007) (*distinguishing employment discrimination claims from other types of claims because plaintiffs, at the pleading stage, are without "information that is both easy to provide and of clear critical importance to the claim.").*

Indeed, before discovery occurs, plaintiffs alleging employment discrimination will rarely know exactly why they were discharged because personnel records are in the employer's possession**.** Pleading Standards, *Harvard Law Review: Vol.123:153, Federal Jurisdiction and Procedure: Civil Procedure, 252, 262 (2009) ("noting the unlikelihood of plaintiffs in employment discrimination cases to have "concrete evidence of a defendant's wrongdoing and*

*motivation before discovery."*).  Because of these similarities, applying the liberal *Swierkiewicz* standard to employment discrimination suits is consistent with current practice.

In Employment discrimination complaints that survive motions to dismiss under *Swierkiewicz*, plaintiffs are able to access information through discovery**.**  This reduces the risk of dismissing ultimately meritorious claims based on procedural technicalities.

In particular, federal courts continue to allow plaintiffs alleging employment discrimination to reach discovery under a liberal plausibility standard**.**  E.g., *Sheppard v. David Evans & Assoc.,* 694 F.3d 1045, 1049 (9th Cir. 2012).

In any case concerning an individual defendant's subjective motivations or private activities, "getting past neutral facts to those suggestive of liability" will be difficult without the aid of discovery. A. Benjamin Spencer, *Understanding Pleading Doctrine, 108 Mich. L. Rev. 1, 36 (2009).*

Because this information is "unknown or unknowable" at the pleading stage, the plausibility standard may be "too unforgiving and unaccommodating, leaving plaintiffs with potentially valid claims with no access to the system." *Id*. This outcome should be avoided: while courts should generally seek to avoid spending judicial resources on frivolous claims, "it is fundamentally improper to prematurely block judicial access to the litigation process in situations where the evidence needed to fully establish a claim can only be obtained during discovery." *Id.*   This concern is particularly compelling for plaintiffs alleging private employer discrimination. *Id.*

## XV. *PRO SE* PLAINTIFF APPEALS THIS COURT TO VACATE THE DISTRICT COURT'S ORDER, AND TO REMAND, SO THAT JUSTICE COULD BE SERVED.

Plaintiff's huge amount of documentation in support of his allegations of continuing retaliatory and coercive violations by the defendants for such a prolonged period of time, and the consequent *negative ripple effect* in the intricately connected academia around the nation, that having effectively and permanently destroyed his high paying and in-demand professional clinical cytogenetic job opportunities to this day, and

**Given the foregoing multiple inferences of erroneous decisions and instances of abuse of discretion at the District Court in the rulings (ECF # 78) in favor of defendants' premature motion to dismiss under Rule 12(b)(6), *pro se* plaintiff appeals this Court to vacate the District Court's Order, and to remand, so that justice could be served.**

Further, plaintiff, being *pro se,* and having meticulously and effectively rebutted each and every one of the defendants' evasive responses with more than 300 relevant documentations and exhibits, renews his plea, through this appeal, for the appointment of *pro bono* counsel's assistance.

Respectfully submitted.

*Pro Se Plaintiff- Appellant*
Syed K. Rafi, PhD.

September 1, 2017

5912 Brill Court
Falls Church, VA 22041-2546